1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SEAN A. O'BRIEN,

11              Petitioner,                 No. 2:10-cv-2472 MCE CKD P

12        vs.

13   LELAND McEWEN,                         FINDINGS & RECOMMENDATIONS

14              Respondent.

15   _____/

16              Petitioner, a state prisoner, seeks through his counsel a writ of habeas corpus

17   pursuant to 28 U.S.C. § 2254.  (ECF No. 1 ("Ptn.").)  Petitioner challenges his 2006 conviction

18   for first degree murder with special circumstances and firearm enhancements, resulting in a

19   sentence of life without parole, plus ten years.  (Id. at 2.)  Respondent has filed an answer (ECF

20   No. 16) and petitioner has filed a traverse (ECF No. 23).  Having carefully considered the

21   applicable law and the record, the undersigned will recommend that the petition be denied.

22                                BACKGROUND

23   I.  Facts

24              In its affirmation of the judgment on appeal, the California Court of Appeal, Third

25   Appellate District, set forth the factual background as follows:

26   /////

Prosecution

1. <u>William Wellman</u>

William Wellman testified for the prosecution against defendants O'Brien and Dickson pursuant to a plea bargain.  Under the terms of that agreement, Wellman agreed to testify truthfully and to plead guilty to first degree murder. The agreement was conditioned on the understanding that if the trial court determined that Wellman testified truthfully, the court would reduce Wellman's conviction to second degree murder, and the district attorney's office would recommend that Wellman be released when he was eligible for parole.

At the time of their crimes, Wellman was 20 years old; Dickson was 17; and O'Brien was 16. Wellman had been friends with Dickson for about two and a half years. They both enjoyed riding BMX bikes together.  Dickson told Wellman they were going to go to a home where some people a little older than they lived, and they would steal some dirt bikes and marijuana. To carry out the plan, Wellman slept over at Dickson's house on February 25, 2003.

Wellman woke up the morning of February 26, 2003, at roughly 7:00 a.m. Their plan was for Dickson to go to school that morning, then meet Wellman at a video store located at the top of Oak Hill Road. Wellman drove to the store and waited until Dickson showed up. FN1  By the time Dickson arrived, Wellman's truck had run out of gas, so they rode in Dickson's truck and went to the house of a friend, Shawn Santelio. They stayed there for about 20 minutes, and then they drove to defendant O'Brien's house. FN2

FN1. An Independence High School administrator stated that school started at 7:55 a.m. Records for February 26, 2003, indicated Dickson was present at the beginning of school, but he reported to the office complaining of feeling ill. A call was made at 8:08 a.m. to his home to contact a parent, but it was unsuccessful. Dickson then checked himself out of school.

FN2. Shawn Santelio was a good friend of Dickson's and an acquaintance of Wellman's. Santelio testified that in late February 2003, Dickson and Wellman stopped by his house in the morning and asked if he wanted to "go jack some dirt bikes." He said no. He did not remember if they came over more than once that day. Wellman had never met O'Brien prior to this time. He and Dickson stayed at O'Brien's house for about 30 to 40 minutes, talking about what was going to happen. FN3  O'Brien explained he thought no one would be in the home they were going to burgle. He said they would find money, marijuana, and dirt bikes there.  Dickson had not known what the plan was until they discussed it with O'Brien.

FN3. Wellman was not wearing a watch that day and had no place

2

to be, so he "wasn't really keeping track of time." On cross-examination, he said they stayed at O'Brien's house "ten minutes at most."

These discussions took place in O'Brien's bedroom. Wellman noticed there was an aquarium in the room that contained exotic fish such as piranhas. He also noticed a couch or love seat in the room. FN4

FN4. Wellman did not know when they arrived at O'Brien's house except that it was sometime after 8:00 a.m. He did not know how long after 8:00 a.m. they had arrived.

From O'Brien's house, the trio proceeded to the Big Horn Gun Shop located on Forni Road, a trip of about five minutes. They rode in Dickson's truck, with Dickson driving. O'Brien brought along a shotgun he had wrapped in a blanket. O'Brien asked Wellman if he would buy shotgun shells, since Wellman was the only person over 18 years old.

The three went inside the gun store, and Wellman asked the clerk for some shotgun shells. He did not know what type of shells to get, so O'Brien told the clerk what they needed. The box of shells did not cost more than five dollars. The trio was inside the store no more than five minutes.

From the gun shop, the young men drove to a home located on Treasure Lane, off of Green Valley Road. Dickson drove, and O'Brien gave Dickson directions. O'Brien stated they were going to go inside when they got to the house. He also said that if anyone was there, he was going to blow them away.

Dickson pulled into the home's driveway, and he parked the truck with the front end facing the house. A white Toyota pickup was parked in the driveway. The three got out of the truck. O'Brien proceeded to the front door. He knocked twice, but no one answered. He walked back to the truck and said, "I don't think anybody is home, anybody is here." He grabbed the shotgun, and all three of the men went to the door.

The front door was open. As they walked inside, a man came out of a side bedroom holding a rifle. The man asked, "What are you doing in my house?" Wellman and Dickson quickly turned around, exited the house, and ran back to the truck. Dickson started the truck up, and as he was doing that, Wellman heard a gunshot from inside the house.

Dickson had put the truck into reverse and had started backing up when O'Brien came out of the house, waving and yelling, "He's dead." Dickson drove the truck back towards the house and got out. He left the truck running, and he told Wellman to turn the truck

3

around. Wellman complied and then went inside the house.

Inside, Wellman saw the victim lying on the floor. Dickson was standing and holding the victim's rifle, and O'Brien was standing and holding the shotgun. Wellman grabbed a marijuana pipe from a table in the living room and put it in his pocket. He then saw Dickson and O'Brien standing in front of a door down the hallway. O'Brien said, "This is the room we want to get into." This was not the same room the victim had come out of. Wellman joined the other two. Dickson kicked open the door, and Wellman and O'Brien went into the room.

Wellman grabbed some marijuana from inside a dresser, and O'Brien took "a lot" of cash from inside a box in the dresser. Dickson then reappeared at the door, and Wellman said, "We should get out of here." The three left the house.

Once inside the truck, they put the victim's rifle and the shotgun under the seat. O'Brien took the cash out of his pocket. He tried to count it but "there was so much adrenaline" that he could not concentrate. He gave about $200 to Wellman.

While driving away on Forni Road, one of the boys suggested they get rid of the victim's rifle. Wellman told them there was a pond coming up. They stopped at the pond. O'Brien got out and threw the rifle into the water.

They then drove back to O'Brien's house. They smoked the marijuana Wellman had stolen. They agreed that they would not talk about what had happened again. After about 20 minutes, Wellman and Dickson left and went to Shawn Santelio's house. On the way there, Dickson told Wellman he was sorry for getting him into this. FN5

FN5. On cross-examination, Wellman stated he had no idea what time the three men arrived back at O'Brien's house after throwing away the rifle in the pond, but if he had to say, it was probably around 11:00 a.m. This differed from the time frames Wellman gave to investigating authorities in his first two interviews with them. In those interviews, Wellman stated that Dickson picked him up at Independence High School that morning sometime between 10:00 a.m. and 11:00 a.m., and that they threw the rifle into the pond sometime between 1:30 p.m. and 2:00 p.m. The jury saw a videotape of the first interview and heard an audiotape of the second interview.

2. Jesse Pine

Jesse Pine resided at the Treasure Lane home in February 2003. The house had two levels, a main level and then a basement. The garage was in the basement level. Three dirt bikes, one street

4

motorcycle, and a few jet skis were stored in the garage.

Pine lived at the Treasure Lane home with Tim Dreher, Eric Rootness, and Kyle Smelser. Pine's and Smelser's bedrooms were located on the main floor across the hall from each other. Smelser's bedroom windows looked out the front of the house towards the driveway and the stairway leading to the house. Smelser owned an off-white Toyota pickup.

At that time, Pine used marijuana, and he sold it to his roommates and friends. One person to whom he sold the drug on occasion was Rootness's stepbrother, Frankie Silici. Silici would come to the Treasure Lane house to purchase marijuana. Oftentimes, Silici would bring a friend or two with him. One of the friends he brought to the house was defendant O'Brien. Pine did not know Wellman or Dickson, and he had no knowledge that either of them had ever visited his house.

Pine left the house for work on February 26, 2003, at around 6:40 a.m. He locked his bedroom door before leaving. Smelser's truck was parked in the driveway when he left. Pine returned home from work at about 3:50 p.m. that day. Smelser's truck was still parked in the same location. Pine was surprised to find the home's front door wide open.

Upon walking in the house, Pine saw Smelser lying on the floor. He ran over and discovered that Smelser had been shot. He began running around the house, looking for anyone and anything. In Smelser's bedroom, he saw an empty gun case on the bed. He noticed the door to his own bedroom had been kicked open. $3,000 in cash was missing from inside his dresser drawer. A large amount of marijuana that he stored in his backpack was still in his room, but his marijuana pipe that he kept on a table in the living room was missing. Pine called 911.

3. The investigation

Deputy Jim Applegate from the El Dorado Sheriff's Department was the first law enforcement officer to arrive at the scene. He found the victim lying on the floor with a gunshot wound to the left side of his head. The body was cool to the touch. Applegate noticed the beginning of lividity, or pooling of the blood, in the victim's fingers.

At approximately 6:00 p.m. on February 26, 2003, forensic pathologist Curtis Rollins, M.D., arrived at the crime scene and examined the victim's body. He concluded the victim had died from a shotgun wound to the head. Death had occurred approximately six to eight hours prior, or between 10:30 a.m. and 12:30 p.m. that day, and more likely closer to 12:30 p.m. He also concluded the distance between the end of the firing gun's barrel

and the victim was between three and four feet.

During the autopsy, Dr. Rollins recovered a plastic shot cup or shot-wad from the wound. He explained the shot-wad is a component of the shotgun shell that is used to hold the pellets together until it opens and lets the pellets out. Dr. Rollins also recovered numerous bird shot pellets.

Detective Paul Moschini of the El Dorado County Sheriff's Department interviewed defendant Dickson on March 4, 2003. Dickson had requested the interview. In this interview, Dickson did not admit to any personal involvement in the killing. Moschini interviewed Dickson a second time on March 7, 2003. At that time, Dickson admitted to going to the Treasure Lane house where Smelser was murdered. Dickson said he went there to "rip off" dirt bikes, money, and marijuana. He drove his own truck to the house. He had never been to the house before.

Dickson told Moschini that when he arrived at the house, a white Toyota pickup truck was parked in the driveway. Dickson stated that after he entered the house, a man came out of a room wearing a dark pair of pants but no shirt. He was carrying a .22 rifle. The man said, "What the fuck are you doing here?" Thinking there was going to be a gunfight, Dickson ran out of the house. After leaving the house, Dickson said, he went to a pond located on Forni Road for the purpose of throwing away the .22 rifle.

Dickson informed Moschini that Wellman was with him when this happened. Dickson had called Wellman and asked him to come along for reassurance because he did not want anything to go wrong.

Dickson showed Moschini the location from where the rifle was thrown into the pond. After Dickson showed Moschini the pond, he took the detective to Wellman. Moschini arrested Wellman.

Deputy sheriffs searched the pond off Forni Road to locate the gun. The divers located the rifle in six feet of water about 17 feet off the shore and near a turnout from the road. The weapon was a Winchester .22 caliber long rifle. It was not loaded.

4. J.D. Petty

Jonathan or "J.D." Petty was a friend of O'Brien's from when the two attended Union Mine High School. They would hang out together all day. Petty also was an acquaintance of Dickson's from school, but he did not know Dickson very well. In February 2003, Petty loaned O'Brien a .20 gauge shotgun. He thought it was either a Winchester or a Remington.

The day before he loaned the gun to O'Brien, Petty had been at

6

O'Brien's house. O'Brien had a box of clay pigeons in his room. He told Petty that he and a couple of his cousins were going trapshooting the next day and they were short one gun. He asked Petty if he could borrow his gun. Petty agreed to drop it off the next day on his way to school.

Petty gave the gun to O'Brien the next morning. Petty called O'Brien from his cell phone at 7:55 a.m. on February 26 when he arrived at O'Brien's drive-way. After Petty pulled up to the house, O'Brien came out and got the gun. The gun was wrapped in blankets or beach towels. Dried mud was caked on the butt of the stock from when Petty had used the gun for duck hunting.

At 11:25 a.m. that same day, O'Brien called Petty and left Petty a message to call back. Petty did so at 11:28 a.m. O'Brien told Petty he could pick up the shotgun. Petty went to O'Brien's house after school to retrieve the gun. Two friends of his, Clifton Sargent and Michael Carrick, were there when he arrived. O'Brien gave Petty the gun and the towels separately. The gun appeared to have been wiped down. There was no mud on the stock. FN6

FN6. The Independence High School administrator confirmed that Petty attended school on February 26 from 7:55 a.m., the time school started, until 2:00 p.m.

O'Brien also gave Petty a box of Winchester .20 gauge shotgun shells. The box's price tag indicated it had been purchased at the Big Horn Gun Shop. One shell was missing from the box. Petty asked O'Brien about the missing shell. O'Brien said he had shot it into a hillside to see what it would do. This explanation did not seem right to Petty because of the way O'Brien had spoken about going trapshooting with his cousins. He thought O'Brien would know what a shotgun would do if he shot it into a hill.

Over the next few days, Petty heard of the killing, and he began hearing rumors that O'Brien was the person who did it. He connected these rumors with the fact that one shell was missing from the box of ammunition O'Brien gave him, and, with his friends Sargent and Carrick, "kind of put things together." Worried that he possessed the murder weapon, Petty, along with Sargent and Carrick, went to a relative's property, smashed the shotgun on a rock, and threw the broken pieces into a ravine. They also threw the ammunition and its box into the ravine.

Later, Petty showed Detective Paul Moschini where he had disposed of the gun, and he assisted the detective in searching the area. Moschini recovered parts of the shotgun, 13 shotgun shells, and a gray Winchester shotgun shell box that had a price tag of $4.99 from Big Horn Gun Shop.FN7

FN7. Terry Fickies, a criminalist for the state Attorney General,

7

compared the shot-wad and the pellets recovered from the victim by pathologist Dr. Rollins to one of the recovered unfired Winchester shotgun shells. Fickies determined the wadding was consistent in color, composition, and design to the wadding from the unfired shell. He also concluded the pellets recovered from the victim were consistent with the pellets from the live round.

### 5. Frankie Silici

Frankie Silici, Eric Rootness's stepbrother, was a friend of O'Brien's. In early 2003, they were hanging out together nearly every day. Silici testified that prior to February 2003, he had taken O'Brien to the Treasure Lane home on two occasions. On both occasions, he purchased marijuana from Pine. He also took O'Brien down into the home's garage to see Rootness's new motorcycle.

On February 26, 2003, Silici called O'Brien's home telephone number at 10:11 a.m. from his cell phone. O'Brien did not have a cell phone at that time of which Silici was aware. Silici did not testify as to the contents of this first phone call or whether he actually reached O'Brien. O'Brien called Silici's cell phone that same day at 11:45 a.m. and left a message indicating he did not have any marijuana. O'Brien called Silici again at 12:17 p.m. indicating he now had marijuana.

### 6. Chantell Michaud

Chantell Michaud was a close friend of O'Brien's. She would speak with him on the phone a few times a week. On February 26, 2003, she called O'Brien at his home at about 10:30 a.m. and spoke with him. O'Brien told her he was going to get some marijuana, money and dirt bikes that day. He said the place where he would get these things had roommates but he did not think they would be home. He told Michaud he was leaving after their phone call.

Michaud spoke with O'Brien that evening at about 6:00 or 7:00 p.m. She asked him if everything had gone okay. O'Brien said, "No, it didn't go okay." He told her he did not want to talk about it over the phone.

Later that evening, Michaud saw a report of Smelser's murder on the television news. The next day, she called O'Brien and tried to discuss the news report with him. He acknowledged he had seen the news report. She asked him if that was what went wrong the day before. He did not answer her. In an interview prior to trial and shortly after the crime, Michaud told sheriff's detectives that O'Brien had actually answered her question. When she asked if the murder was what went wrong, O'Brien said, "Yeah." "Pretty much."

/////

### 7. Richard Anschutz

Richard Anschutz was a close friend of O'Brien's. O'Brien called Anschutz at 11:31 a.m., February 26, 2003, and left a message. Anschutz returned the call at 11:34 a.m. During that conversation, O'Brien told Anschutz he had $2,500 and wanted to purchase some marijuana. Anschutz asked O'Brien where he got the money. O'Brien said, "I don't want to tell you over the phone."

Anschutz and O'Brien spoke again with each other at 12:06 p.m., 12:11 p.m., and 6:00 p.m. that day. All of these calls concerned Anschutz's efforts to find someone to sell O'Brien some marijuana. During either the 6:00 p.m. call or another call two days later, O'Brien informed Anschutz that he no longer needed marijuana.

### 8. Richard Lacerte

Richard Lacerte was another good friend of O'Brien's. Their families socialized and traveled together. O'Brien called Lacerte at 11:32 a.m. on February 26, 2003. Lacerte returned the call at 11:47 a.m. to O'Brien's home. Telephone records for that same date show Lacerte called O'Brien at 5:37 p.m. and O'Brien called Lacerte at 9:30 p.m. During one of those conversations, O'Brien told Lacerte that he had "a couple grand" and was going to purchase some marijuana. He did not explain how he obtained the money, nor did he ask Lacerte if he knew where he could buy the drugs. Also during one of those calls, O'Brien explained that his mother had found his marijuana pipes, and she was going to send him to school in Oregon.

### 9. Amanda O'Brien

Amanda O'Brien is defendant O'Brien's sister. She and O'Brien had originally planned for her to stop by O'Brien's house on February 26, 2003, at 1:30 p.m. so that O'Brien could install a stereo in her car. At 11:47 a.m. on that day, however, O'Brien called Amanda and asked her to come by earlier. She and her daughter arrived at the house sometime between 12:15 p.m. and 12:30 p.m. that afternoon.

When she arrived, O'Brien was on the front porch smoking marijuana with Clifton Sargent, Michael Carrick, and Treva Fudge. She had not met any of these people before that day. A few minutes after she arrived, Carrick took Fudge back to school. At around 1:00 p.m., they ordered pizza from Round Table Pizza. Carrick left to pick up the pizza at approximately 1:15 p.m., and returned some 45 minutes later, an unusually long time to make that trip. Amanda left the house around 2:30 p.m.

### 10. Clifton Sargent

Clifton Sargent was a friend of O'Brien's though J.D. Petty, and he

was an acquaintance of Dickson's from school. He also was Michael Carrick's cousin. FN8 On February 26, 2003, Sargent went to O'Brien's house around noon. Carrick was there, as was O'Brien's sister, Amanda, and a small child. At one point, O'Brien took Sargent aside and showed him a "wad of cash." Sargent asked O'Brien where he got it. O'Brien said he killed someone for it. Sargent thought O'Brien was joking and he laughed. Sargent did not tell Petty or Carrick about O'Brien's comment because he did not believe it.

FN8. At trial, Carrick asserted his Fifth Amendment privilege and did not testify.

Sargent stayed at O'Brien's house for a couple of hours. He watched O'Brien install a stereo in Amanda's car. They ordered a pizza and hung out. Sargent also saw O'Brien give a shotgun and a box of ammunition to J.D. Petty. He thought this occurred around the day of the car stereo installation or within the next couple of days. Sargent confirmed that he, Petty and Carrick destroyed Petty's shotgun.

Sargent, O'Brien, and Carrick contacted someone that afternoon about purchasing some marijuana. That same day or shortly thereafter, the trio met Nate McKelvie, an acquaintance of Carrick's, to purchase marijuana. O'Brien had the money for that transaction, and Sargent was "pretty sure" it was the same money O'Brien had showed him before. At some point, O'Brien had told Sargent he wanted to use the money to buy marijuana.

Sargent was interviewed by detectives twice. He lied during the first interview, but met with detectives a second time the same day. During the second interview, Sargent stated that O'Brien had in fact told him how much cash was in the wad of money; a little less than $2,400.

In that same interview, Sargent relayed a conversation he had had with O'Brien, where O'Brien told him he planned to go to a house to get marijuana at a time when no one would be home. O'Brien also told Sargent that the guy was not supposed to be there. When O'Brien went inside the house, the man came out with a .22 rifle. It was a standoff, and O'Brien said he fired first because he was standing there with a gun being pointed at him.

## 11. Carl Christoffersen

Carl Christoffersen was working at Big Horn Gun Shop in February 2003. He testified that the store opened on weekday mornings at 10:00 a.m. He recalled selling a box of shotgun shells in February 2003 to a tall young man who was accompanied by two younger and shorter men. They were the first customers in the door that day, right after the store opened.

Detective Tom Hoagland of the El Dorado County Sheriff's Department testified that he showed Christoffersen photos of O'Brien, Dickson, and Wellman in March 2003. Christoffersen identified Wellman as possibly the tall young man to whom he had sold the box of shotgun shells.

12. Experimental evidence

Detective Hoagland also testified that, based on information he obtained from the investigation, he attempted to determine how long it would have taken for O'Brien, Dickson, and Wellman to make the round trip from O'Brien's house to the Treasure Lane home and back to O'Brien's. He drove from O'Brien's house to the Big Horn Gun Shop, where he allowed time for purchasing the ammunition to occur. Then he drove to the Treasure Lane house, and he allowed five minutes for the murder and robbery to occur. From there, he drove down Forni Road and stopped for five seconds to simulate the throwing of the rifle into the pond. He then drove back to O'Brien's house. Hoagland performed these drives around 10:00 or 10:15 a.m. He drove four different routes for reaching these places in order. The times for each route were 36 minutes, 39 minutes, 40 minutes, and 47 minutes, respectively.

O'Brien's Defense

O'Brien testified on his own behalf. He claimed he awoke on February 26, 2003, at 10:15 a.m. when Frankie Silici called him. After showering, he called Chantell Michaud around 10:30 a.m. He called her to make arrangements to see her that day or the next day because she was going into Juvenile Hall soon. They spoke for two or three minutes.

 O'Brien did things around the house until 10:45 a.m., when he called Silici back. He left a message that he was going to be home that afternoon. FN9  Earlier, he had informed Silici that he would be at his mother's automobile repair shop that afternoon installing his sister's car stereo, but his plans had changed. He then started getting things ready for the stereo installation.

FN9. O'Brien's testimony was the only evidence of a phone call by him to Silici at 10:45 a.m. Silici's cell phone bill showed that no calls were made to or from Silici's cell phone on February 26, 2003, between 10:11 a.m. and 11:45 a.m.

Sometime during the morning, O'Brien had called Michael Carrick. Carrick called him back at around 11:15 a.m. Carrick was going to come over, hang out, and smoke some marijuana.

A little before 11:30 a.m., O'Brien called Richard Anschutz, and left him a message to call him back. Then he called Richard

11

Lacerte to see if he knew where Anschutz was. After that call, Anschutz called O'Brien back at about 11:35 a.m.

Around 11:45 a.m., O'Brien called Silici again to inform him he had no marijuana and that Silici should not come over after school as he was planning to do. Then O'Brien called his sister, Amanda, to tell her to come over earlier because he was going to be home and not doing anything.

He called Lacerte again and told him he was trying to get some marijuana. He explained he had some money from selling pot on prior occasions, and that Carrick was also supplying some money.

At around 11:45 a.m., Clifton Sargent arrived at O'Brien's house. Five minutes later, Carrick and Treva Fudge arrived. They came over to hang out and because Carrick had some money to put towards buying marijuana.

At around 12:15 p.m., O'Brien called Silici again. He told him that he did have some marijuana now. Carrick and Sargent both had brought some with them.

By 12:30 p.m., Amanda had arrived with her daughter. O'Brien, Sargent, Carrick, and Fudge were on the front porch smoking marijuana when Amanda arrived. Shortly afterward, Carrick took Fudge back to school, and O'Brien began installing the stereo in Amanda's car. The installation took about an hour and a half to two hours. Afterward, the group ate pizza, and then Amanda left.

O'Brien, Sargent, and Carrick then went to Sargent's house. There, Sargent contacted his cousin, Nate McKelvie, to purchase marijuana. FN10 They ended up purchasing $2,000 worth. Carrick supplied $1,200, and O'Brien supplied $800. O'Brien had obtained the money from selling marijuana. FN11  He also had obtained money by withdrawing cash from his mother's bank account. On four occasions during February, O'Brien had taken his mother's ATM card without her permission and used it to get a total of $1,400 from her account.

FN10. McKelvie was called as a defense witness, but he asserted his Fifth Amendment privilege and did not testify.

FN11. Anthony Campana had known O'Brien for six years. He purchased marijuana from O'Brien over a period of three months that ended about two weeks before the killing. He thought he may have bought marijuana from O'Brien 15 times, each time buying a $20-bag.

Carrick made contact with McKelvie at around 3:30 p.m. that afternoon. O'Brien, Sargent, and Carrick met McKelvie in El Dorado Hills, and then met up with McKelvie's dealer at about

12

5:00 p.m. They purchased about a half-pound of marijuana. They drove back home and divided up the marijuana. The three then went out and played pool. At about 8:00 p.m., Carrick and Sargent dropped O'Brien off at his home.

Two days later, O'Brien was taken to Oregon to attend a boarding school where he could rehabilitate from his marijuana addiction. He was attending this school when he was arrested.

 O'Brien admitted that he and Silici had gone to the Treasure Lane house around three times to pur-chase marijuana from Silici's stepbrother, Eric Rootness. O'Brien did not buy the drug from Jesse Pine. Rather, he would give the money to Silici, who gave the money to Rootness, who then gave Silici the drugs. O'Brien said he did not know Pine sold marijuana or kept a large sum of cash in his bedroom.FN12

FN12. Eric Rootness confirmed this method of handling the drug purchases. After Silici gave him money, Rootness gave the money to Pine, who then gave Rootness the drugs to give to Silici. Rootness had seen O'Brien and Silici at the Treasure Lane house three or four times. Rootness saw O'Brien at least once use the hallway that led to the bedrooms in order to get to the bathroom.

O'Brien denied asking Petty for a shotgun during the last week of February 2003. He admitted knowing defendant Dickson, but he said they never socialized or hung out together. He did not know William Wellman. O'Brien denied the statements ascribed to him by Chantell Michaud. He denied driving to the Treasure Lane home on February 26, 2003, and he denied killing the victim.

On cross-examination, O'Brien admitted that he did not tell the police when they met with him on March 1, 2003, many of the details he recited in his trial testimony. He claimed his memory of the events was now better at trial than it was three days after February 26 because he had been thinking about the case.

The defense recalled Detective Hoagland as a witness. Hoagland had been present during three law enforcement interviews of William Wellman. The first two were recorded; the third was not as it was just for trial preparation. During the third interview, however, Wellman provided some new facts. He revealed that he felt the time frame for the events was different from what he said in the first two interviews. Wellman also discussed the interior of O'Brien's room, and he mentioned for the first time the existence of a fish tank.

Dickson's Defense

Defendant Dickson also testified on his own behalf. He attended Independence High School daily from 8:00 a.m. until about 1:00

13

p.m., and then he went to his job. He met William Wellman in his freshman year. They spent time riding BMX bikes and four-wheeling in Dickson's truck. He was also friends with Michael Carrick.

A few days before February 26, 2003, Carrick called Dickson. They chatted for a few minutes, and then Carrick handed the phone to O'Brien. Dickson did not know O'Brien well. He had seen him hanging out with Carrick, Clifton Sargent, and J.D. Petty.

O'Brien asked Dickson what he was doing on Wednesday [the 26th] and if he could borrow Dickson's truck. Dickson said he needed his truck for work. Dickson had also planned to skip school that morning and take Wellman four-wheeling. Dickson agreed to drop O'Brien off at a friend's house. O'Brien had said he had purchased a dirt bike and was going there to pick up some marijuana and money. O'Brien gave Dickson instructions on how to get to his house.

Tuesday evening, Wellman stayed over at Dickson's house so they could leave in the morning to go four-wheeling. Dickson told Wellman that before they left, he had to drop a friend of Carrick's off at his buddy's house.

Wednesday morning, both boys drove their trucks to the Lions Hall parking lot. Dickson walked to his school, while Wellman waited in his truck. Dickson checked himself out of school after only a few minutes, lying to the office staff that he was sick. He went back to the parking lot. He and Wellman got in Dickson's truck, and they drove into Placerville for some donuts and hot chocolate. Then they drove to O'Brien's house. Dickson could not recall what time they arrived.

Dickson introduced Wellman to O'Brien. O'Brien showed the boys his own truck, and then they went inside the house to O'Brien's room. Dickson described the room as having a fish tank, a truck seat and a little end couch. There was some conversation about O'Brien's fish. Wellman picked up a clay pigeon and talked with O'Brien about shooting. At one point, O'Brien asked if it would be all right to return his brother's shotgun. Dickson saw no problem with that. O'Brien also asked if they could stop by the Big Horn Gun Shop.

The three left in Dickson's truck. Dickson thought they had spent five or 10 minutes at O'Brien's house. Dickson noticed O'Brien had placed something on the floorboards that was wrapped in a blanket, but he did not know at that time what it was.

They drove to Big Horn Gun Shop. All three went inside and looked around for a minute. Then Wellman asked the storekeeper for a box of shells. Dickson could not remember any discussion

14

prior to entering the store about who would purchase shells.

Back in the truck, O'Brien gave Dickson directions. At this time, there was no indication to Dickson that a robbery was going to take place.

Dickson parked his truck next to a white pickup truck already parked in the driveway. O'Brien got out of the truck and knocked on the door. He opened the door, then came back to the truck, saying, "I believe my buddy is home." He picked up the gun with the blanket, unwrapped it, and said, "Come on in. I can get your $20 for gas." The three walked up to the house.

Immediately after they walked in, someone came out of a bedroom with a rifle and said, "What the fuck are you doing in my house, Sean?" Dickson and Wellman turned and started to leave. The last thing Dickson saw before he left was two guns pointing at each other.

Dickson and Wellman got into Dickson's truck. Wellman crouched down. Dickson scrambled for his keys and tried to start the truck. As soon as he started the truck and put it in gear, O'Brien came out of the house, pointed the gun at them, and said, "Stop or I'll shoot. He's dead. He's dead. He's dead." O'Brien directed Dickson to come back to the house and to have Wellman turn the truck around.

From the doorstep, Dickson heard O'Brien going through drawers and cabinets. Dickson did not go back inside the house, but Wellman did. O'Brien slammed open a bedroom door and said, "Come here." Both O'Brien and Wellman went into the room for less than a minute. Someone yelled, "Let's get the hell out of here," and the three ran to the truck. O'Brien was carrying the shotgun. Dickson did not see who was carrying the rifle.

O'Brien directed Dickson to drive to a pond on Forni Road. While driving there, O'Brien said J.D. Petty had given him the shotgun. At the pond, O'Brien opened the door and threw the rifle into the pond.

They drove back to O'Brien's house. O'Brien said he did not want to see either Dickson or Wellman again. They were not to tell anyone about what happened. He got out and slammed the door. That was the last time Dickson saw him.

Dickson and Wellman drove back to Lions Hall. They drove their trucks to a gas station and had a brief discussion. Then Dickson went to work.

/////

1   People v. O'Brien, 2008 WL 2955548, **1-11 (Cal. App. 3 Dist. Aug 4, 2008)[1].  The facts as set

2   forth by the state court of appeal are presumed correct.  28 U.S.C. § 2254(e)(1).

3   II.  Procedural History

4              Consistent with this court's review of the record, the state court of appeal

5   summarized proceedings in the trial court as follows:

6           The jury found O'Brien and Dickson guilty of first degree murder.
            (Pen. Code, § 187, subd. (a).) FN13 It found true the special
7           circumstances that the murder was committed during the course of
            a robbery and during the course of a residential burglary. (§ 190.2,
8           subd. (a)(17)(A) & (G).)

9           FN13. Hereafter, undesignated section references are to the Penal
            Code.
10
            The jury also determined that O'Brien intentionally discharged a
11          firearm causing great bodily injury within the meaning of section
            12022.53, subdivisions (b), (c), and (d). As to Dickson, the jury
12          determined that a principal in the offense was armed with a firearm
            during the commission of the crime within the meaning of section
13          12022, subdivision (a)(1).

14          Prior to sentencing, O'Brien filed a motion to disqualify the trial
            court judge, Daniel Proud, on the ground that the judge was a
15          potential witness in O'Brien's yet-to-be-filed motion for new trial.
            O'Brien argued that while serving as defense counsel in an earlier
16          case, Judge Proud may have obtained incriminating information
            regarding the prosecution's pathologist in this case, Dr. Rollins,
17          that should have been disclosed here under Brady[2] but was not.
            Ultimately, we issued a writ of mandate directing the trial court to
18          grant the motion to recuse Judge Proud. (O'Brien v. Superior
            Court, C049141.)
19
            While the writ proceedings were pending in our court, O'Brien
20          filed a motion to disqualify the El Dorado County District Attorney
            and the trial prosecutor based on the same Brady violation.
21
            Responding to our writ, the trial court assigned the case to Judge
22          Douglas Phimister for "all pending motions." If Judge Phimister's
            rulings resulted in a new trial, the new trial would be heard by
23          Judge Jerald M. Lasarow.

24   _____

         [1] The court of appeal's opinion is also attached to respondent's answer to the petition.
25   (ECF No. 16-1.)

26       [2] Brady v. Maryland, 373 U.S. 83 (1963).

O'Brien filed a motion for new trial. He argued a new trial was required on the following grounds: insufficient evidence supported the verdict; there was newly discovered evidence or trial counsel rendered ineffective assistance for failing to present this evidence; the prosecution's alleged <u>Brady</u> violation; and juror misconduct.

The trial court denied both the motion to disqualify the district attorney and the motion for new trial.

The trial court sentenced O'Brien to a prison term of life without parole on the murder count, and a consecutive determinate sentence of 10 years for the firearm enhancement under section 12022 .53, subdivision (b).

<u>People v. O'Brien</u>, 2008 WL 2955548, *11.

Petitioner was sentenced on October 26, 2006. (CT at 2734-35.) On August 4, 2008, the California Court of Appeal for the Third Appellate District struck the robbery special circumstance finding but otherwise affirmed the judgment in a reasoned decision.[3] <u>People v. O'Brien</u>, <u>supra</u>. The California Supreme Court denied review on November 12, 2008. (Lod. Doc. 9.[4] )

On April 20, 2009, petitioner filed a petition for writ of habeas corpus in the El Dorado Superior Court, which was denied in a reasoned decision on October 30, 2009. (Lod. Doc. 10 ("Sup. Ct. Op.").)  On February 9, 2010, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, which was summarily denied on February 18, 2010. (Lod. Doc. 11.)  On March 1, 2010, petitioner filed a petition for review in the California Supreme Court, which was summarily denied on May 12, 2010. (Lod. Doc. 12-15.)

---

[3] On direct appeal, petitioner argued unsuccessfully that his sentence of life without parole constituted cruel and unusual punishment under the Eighth Amendment.  (Lod. Doc. 3 at 94-101.)  In <u>Miller v. Alabama</u>, ___ U.S. ___, 132 S.Ct. 2455 (2012), the Supreme Court held that a mandatory sentence of life without the possibility of parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishment.  Petitioner does not bring an Eighth Amendment claim in the instant petition, nor does it appear that he presented such a claim to the California Supreme Court.  (<u>See</u> Lod. Docs. 9, 12.)  Thus the court merely notes it herein.

[4] Lodged documents refer to those documents lodged by respondent on April 18, 2011. (ECF No. 17.)

1    Petitioner filed the instant petition on September 14, 2010.  (Ptn.)

2                                    ANALYSIS

3    I.  AEDPA

4            The statutory limitations of federal courts' power to issue habeas corpus relief for

5    persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

6    Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

7            An application for a writ of habeas corpus on behalf of a person in
             custody pursuant to the judgment of a State court shall not be
8            granted with respect to any claim that was adjudicated on the
             merits in State court proceedings unless the adjudication of the
9            claim-

10                   (1) resulted in a decision that was contrary to, or
                     involved an unreasonable application of, clearly
11                   established Federal law, as determined by the
                     Supreme Court of the United States; or
12
                     (2) resulted in a decision that was based on an
13                   unreasonable determination of the facts in light of
                     the evidence presented in the State court
14                   proceeding.

15           As a preliminary matter, the Supreme Court has recently held and reconfirmed

16   "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to

17   have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

18   Rather, "when a federal claim has been presented to a state court and the state court has denied

19   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

20   of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

21   v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

22   whether a decision appearing to rest on federal grounds was decided on another basis).  "The

23   presumption may be overcome when there is reason to think some other explanation for the state

24   court's decision is more likely."  Id. at 785.

25           The Supreme Court has set forth the operative standard for federal habeas review

26   of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an

                                         18

1   *unreasonable* application of federal law is different from an *incorrect* application of federal

2   law.'"  Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).

3   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

4   'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

5   citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

6   determine what arguments or theories supported or . . could have supported[] the state court's

7   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

8   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

9   "Evaluating whether a rule application was unreasonable requires considering the rule's

10  specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

11  case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

12  short of imposing a complete bar of federal court relitigation of claims already rejected in state

13  court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does

14  not mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v.

15  Andrade, 538 U.S. 63, 75 (2003).

16        The undersigned also finds that the same deference is paid to the factual

17  determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

18  presumed to be correct subject only to a review of the record which demonstrates that the factual

19  finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

20  light of the evidence presented in the state court proceeding."  It makes no sense to interpret

21  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

22  § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

23  same record could not abide by the state court factual determination.  A petitioner must show

24  clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

25  U.S. 333, 338 (2006).

26  /////

1    The habeas corpus petitioner bears the burden of demonstrating the objectively

2  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

3  Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

4  court's ruling on the claim being presented in federal court was so lacking in justification that

5  there was an error well understood and comprehended in existing law beyond any possibility for

6  fairminded disagreement."  Harrington, supra, 131 S.Ct. at 786-787.  Clearly established" law is

7  law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van

8  Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will

9  not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006)

10  (established law not permitting state sponsored practices to inject bias into a criminal proceeding

11  by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed

12  guards does not qualify as clearly established law when spectators' conduct is the alleged cause

13  of bias injection).  The established Supreme Court authority reviewed must be a pronouncement

14  on constitutional principles, or other controlling federal law, as opposed to a pronouncement of

15  statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

16    The state courts need not have cited to federal authority, or even have indicated

17  awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8. Where the

18  state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

19  federal court will independently review the record in adjudication of that issue.  "Independent

20  review of the record is not de novo review of the constitutional issue, but rather, the only method

21  by which we can determine whether a silent state court decision is objectively unreasonable."

22  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

23    "When a state court rejects a federal claim without expressly addressing that

24  claim, a federal habeas court must presume that the federal claim was adjudicated on the merits –

25  but that presumption can in some limited circumstances be rebutted."  Johnson v. Williams, No.

26  11-465, slip op. at 10, 568 U.S. _____ (Feb. 20, 2013).  "When the evidence leads very clearly to

1   the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles

2   the prisoner to" de novo review of the claim. Id., slip op. at 13.

3   II.   Petitioner's Claims

4   A.   Brady Claims

5           In Claim One, petitioner asserts two separate Brady claims, arguing that the

6   prosecution team failed to provide material and favorable evidence to the defense in violation of

7   petitioner's right to due process and a fair trial.  Petitioner contends that "[b]oth Brady violations

8   concerned the single most important factual issue at . . . trial: the timing of the shooting."  (Ptn. at

9   39.)  The court addresses these claims in turn.

10          The Supreme Court has found the Due Process Clause of the Fourteenth

11  Amendment requires that, upon request, a criminal defendant be provided by the prosecution

12  with all evidence in their possession which is material to guilt or innocence.  Brady v. Maryland,

13  373 U.S. 83, 87 (1963).  Evidence is material if there is a reasonable probability that, had the

14  evidence been disclosed to the defense, the result of the proceedings would have been different.

15  U.S. v. Bagley, 473 U.S. 667, 682 (1985).  To succeed on a Brady claim, a petitioner must

16  establish that the undisclosed evidence was: (1) favorable to the accused, either as exculpatory or

17  impeachment evidence, (2) suppressed by the prosecution, either willfully or inadvertently, and

18  (3) material, so that prejudice to the defense resulted from its suppression.  Strickler v. Greene,

19  527 U.S. 263, 281–82 (1999).  The reviewing court examines the withheld evidence individually

20  and cumulatively.  See Kyles v. Witley, 514 U.S. 419, 436-37 & n. 10.

21          The accused has suffered prejudice only if the suppression undermines confidence

22  in the outcome of the trial.  Benn v. Lambert, 283 F.3d 1040, 1053 (9th Cir. 2002) (citing Bagley,

23  473 U.S. at 676).  The mere possibility that an item of undisclosed information might have

24  helped the defense, or might have affected the outcome of the trial, does not establish materiality

25  in the constitutional sense.  Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005).  However,

26  the petitioner need not show that he would more likely than not have been acquitted had the

1  evidence been disclosed.  Kyles, 514 U.S. at 434-35.  Rather, the touchstone of the inquiry is

2  whether petitioner received a fair trial that resulted in a verdict "worthy of confidence."  Id. at

3  434.

4  1.  Wellman Report

5  a.  Claim

6    Petitioner asserts: "The first Brady violation concerned a four-page report that was

7  not disclosed to [petitioner and his trial counsel] until after trial commenced."  (Ptn. at 39.)  "On

8  the afternoon of February 4, 2004, after trial had begun, [defense counsel] Clark received as

9  discovery from the prosecutor a four-page police report concerning an interview of William

10  Wellman.  The report was written by Detective Hoagland of the El Dorado County Sheriff's

11  Office."  (Ptn. at 49; see Lod. Doc. 11[5], Exhibits at 184-187.)

12    "Since Wellman's arrest on March 7, 2003, until the start of trial on February 3,

13  2004, O'Brien was [led] to believe that the prosecution would assert that the shooting took place

14  after 11:30 a.m. [on February 26, 2003].  For that time frame, Clark and O'Brien investigated and

15  were prepared to present a complete alibi at trial."  (Ptn. at 55.)  However, Wellman's latest

16  recounting of events, as described in the report, suggested that the shooting had taken place

17  before 11:30 a.m..  (Id. at 39; see Lod. Doc. 11, Exhibits at 184-185 (documenting Wellman's

18  statement that he and Dickson arrived at O'Brien's house between 9:00 and 9:30 a.m. and stayed

19  for approximately fifteen minutes before driving to the Big Horn Gunshop, where they left after

20  approximately five minutes and drove directly to Kyle Smelser's house).)

21    Petitioner contends that the Wellman report was prepared on January 2, 2004 but

22  not disclosed to the defense until February 4, 2004, one day after trial began.[6]  (Ptn. at 40.)  "As a

23  —————————————————

24   [5] Petition for writ of habeas corpus filed in the California Court of Appeal on February 9, 2010.

25   [6] It is unclear from the face of the Wellman report exactly when it was prepared.  At the
26  top, it is dated February 4, 2004, but the content recounts Detective Hoagland's interview with
   Wellman on January 2, 2004.  The report also describes actions by Hoagland and another

result of the untimely disclosure of [the report], O'Brien's defense at trial was sandbagged.  That is, the alibi defense that O'Brien had investigated and was prepared to present at trial was rendered irrelevant[.]" (Id.)  Petitioner asserts that the late disclosure of the Wellman report "severely prejudiced" him at trial, as it "left him with no opportunity to either investigate the new information or alter the defense he was already prepared to present."[7] (Id. at 56.)

At trial, Wellman testified on direct examination that he, Dickson, and petitioner had left the gun shop and drove to the scene of the shooting before 10:00 a.m.. (Lod. Doc. 2, Reporter's Transcript on Appeal ("RT") 439.)  Defense counsel cross-examined Wellman at length about the fact that he had recently changed his account about the timing of events.  (RT 457-468.)  Wellman testified that his memory of the incident was better now than when he was interviewed by police a few days after the shooting, as he had been in custody for almost a year and "had some time to think and ponder what happened."  (RT 457-458.)  He testified that he was "not sure" how he formed a different conclusion about the timing of events during his eleven months in jail, and admitted that he had no reason to keep track of time on the day of the shooting.  (RT 459-460.)  Defense counsel and Wellman then had the following exchange:

> Q: Now my question to you, sir, is: What facts did you recall that led you to believe that the events actually happened two hours earlier than the original times you told the detectives?
>
> A: Um, just the fact that when I had the first interview with the detectives, um, my mind wasn't on what I was doing before it was – on what had actually happened.  Those things weren't important at the time, so I was just kind of improvising, I guess you could say.
>
> Q: You were improvising?
>
> A: Yeah.

---

detective on January 3, 2004.  (Lod. Doc. 11, Exhibits at 184-187.)

[7] In a separate claim, discussed below, petitioner asserts that defense counsel Clark's failure to seek a continuance or any other remedy as a result of the untimely disclosure of the Wellman report constituted ineffective assistance of counsel.

Q: I see.  I see.  Now what do you mean by 'improvising'?  What were you doing?

A: Just telling them – I told them what I told them.  Basically I lied about it.  I couldn't tell you why.   But as time wore on, as I sat in the jail, I thought about it a lot harder, you know.  I realized that I had told them –

Q: You lied about the times during your interview with the detectives?

A: Not on purpose, but yeah.

(RT 464-465.)

In his closing argument, the prosecutor argued that, given the coroner's estimation of the time of death, the "outside window" for the shooting was 10:18 a.m. to 12:30 p.m.  (RT 1675.)   In light of evidence that petitioner had been talking on the phone at various times that morning, the prosecutor asserted that the shooting itself took place between 10:45 and 11:30 a.m., during the forty-five minute gap in petitioner's alibi.  (RT 1676-1677.)  Addressing Wellman's differing accounts of the timing of events, the prosecutor stated that Wellman had consistently told detectives, who "kept pressing him for times," that he was not sure about the times.  "He had no watch.  He had no place to be.  Time was not a factor in Mr. Wellman's life back in February of 2003."  However, the jury did not "have to rely on Mr. Wellman to determine what time things happened" as there was other evidence of timing.  (RT 1661-1662.)

b. State Court Opinion

In the last reasoned decision on this claim, the El Dorado County Superior Court wrote:

Petitioner seeks relief for the alleged prosecutorial violation of Brady v. Maryland, 373 U.S. 83 (1963), and California Penal Code Section 1054.7.  Petitioner specifically complains that the report of a recent interview with witness William Wellman was not provided to defense counsel until the day after the jury trial started.  Six days after the report was disclosed, the jury was sworn in, and five days after that, Wellman testified. [FN 4]

[FN 4: Petitioner and Respondent vehemently disagree as to the

24

date of Wellman's interview.  Petitioner claims that said interview occurred on January 2, 2004, but was not disclosed until February 4, 2004.  On the other hand, Respondent claims that the interview occurred on February 2nd, and that discovery was provided two days thereafter.  The court does not address this dispute, for it is not necessary to do so in order to resolve the Petitioner's request for relief.]

Habeas corpus generally cannot serve as a second appeal.  In re Waltreus, 62 Cal. 2d 218, 222 (1965).  It is clear that claims a defendant raised on direct appeal, or which could have been raised on direct appeal, can not be pursued via a habeas corpus petition.  In re Dixon, 41 Cal. 2d 756 (1953).

Petitioner asserts that since the issue regarding the Wellman discovery was not appealed, he should be permitted to pursue this issue via habeas corpus.  But, in In re Seaton, 34 Cal. 4th 193, 199-200 (2004), the California Supreme Court determined that a criminal defendant can not be permitted to simply "sit on his or her rights" at trial.  The Court then held that "just as a defendant generally may not raise on appeal a claim not raised at trial . . . a defendant should not be allowed to raise on habeas corpus an issue that could have been presented at trial."  Id. at 200.

The bar to habeas corpus recognized in Seaton clearly applies to the instant case.  Trial counsel was well aware that discovery was being belatedly provided to him.  He could have objected and sought a continuance of the trial.  Counsel, however, chose not to do so. [FN 5]

[FN 5: Trial counsel detailed his reasons for not seeking a continuance in Paragraphs 18 and 19 of his declaration, which is included in Petitioner's Exhibits, pages 0014-0016.]

In In re Harris, 5 Cal. 4th 813, 829-841 (1993), the Court recognized that there are four exceptions to the rule that a defendant should receive only two chances at judicial review, to wit, a trial and an appeal: 1) the alleged Constitutional error is clear and fundamental and strikes at the heart of the trial process; 2) the trial court lacked fundamental jurisdiction; 3) the trial court acted in excess of its jurisdiction; and 4) there was a change in the law regarding an issue which had been rejected on appeal.  None of these exceptions, however, applies to the case at bar.

Accordingly, pursuant to Seaton, supra, the court must reject the Petitioner's first ground for relief.

(Sup. Ct. Op. at 2-4.)

/////

c. Discussion

In his answer to the instant petition, respondent argues that this claim is procedurally barred.  As set forth above, the superior court found that petitioner's first Brady claim was barred because it was not raised either at trial or on appeal.[8]

As a general rule, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Walker v. Martin, ―― U.S. ――, ――, 131 S. Ct. 1120, 1127 (2011) (quoting Beard v. Kindler, 558 U.S. 53 (2009).)  Procedural default can only block a claim from federal habeas review if the state court, "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263.  This means that the state court must have specifically stated that it was denying relief on a procedural ground. See Ylst, 501 U.S. at  803; Acosta–Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993).

Here, the superior court found that, because petitioner's first Brady claim was not raised on direct appeal, it was barred under the rule set forth in Ex Parte Dixon, 41 Cal. 2d 756, 759 (1953); see also In re Harris, 5 Cal. 4th 813, 829 (1993).  The court additionally found that, because the claim was not raised at trial, it was barred under the rule set forth in In re Seaton, 34 Cal. 4th 193, 199-200 (2004).  Under the procedural bar doctrine, a state court's invocation of Dixon may serve as an independent and adequate state ground.  See, e.g., Gibson v. Hartley, 2012 WL 4468505, at *10 (E.D. Cal. Sept. 26, 2012); Cantrell v. Evans, 2010 WL 1170063, at

―――――――――――――――

[8] Petitioner subsequently asserted this claim in his petitions for writ of habeas corpus filed with the California Court of Appeal and the California Supreme Court.  (Lod. Docs. 11, 12.)  Both courts summarily denied the petitions without citation. (Lod. Docs. 11, 15.)  When a state procedural bar is applied by a state trial court and relief is summarily denied by the state's higher courts, a federal court looks to the last reasoned state court decision as the basis for the state court judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)  ("Where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.").  Accordingly, the undersigned looks through the state appellate courts' summary denials of petitioner's habeas petitions to the order by the superior court finding the instant claim barred.

1   *13–14 (E.D. Cal. Mar. 24, 2010).

2      In his traverse, petitioner argues that <u>Dixon</u> does not apply because the first <u>Brady</u>

3   claim was never raised in the trial court and preserved there, and thus could not have been raised

4   on appeal.  <u>See</u> <u>Seaton</u>, 34 Cal. 4th at 201, fn. 4 ("What we mean when we invoke the <u>Dixon</u> bar

5   is that the claim is *based on the appellate record*, and thus was fully cognizable on appeal insofar

6   as it was preserved at trial.") (emphasis in original).)   Petitioner further argues that the state

7   courts' reliance on <u>Seaton</u> does not bar federal habeas review because the <u>Seaton</u> rule was not

8   "'firmly established and regularly followed' at the time it was applied by the state court."  (ECF

9   No. 23 at 15.)  The relevant time period for evaluating whether a state's procedural rule was

10  regularly and consistently followed is the time of the purported default.  <u>Calderon v. Bean</u>, 96

11  F.3d 1126, 1130 (9th Cir. 1996).  Here, the purported default took place when defense counsel

12  failed to object at trial to the late disclosure of the Wellman report in February 2004.  <u>See</u> <u>Fields</u>

13  <u>v. Calderon</u>, 125 F.3d 757, 760–61 (9th Cir. 1997).  Petitioner points out that the California

14  Supreme Court issued its decision in <u>Seaton</u> on August 23, 2004, after petitioner's trial ended.

15  Thus, he argues, a <u>Seaton</u> bar cannot be considered adequate in this case.

16     Certainly by February 2004, it was well-established that the failure to timely

17  object in the trial court on the ground advanced on review serves to bar consideration of the issue

18  by the appellate courts.  <u>See</u>, <u>e.g.</u>, Cal. Penal Code § 1259; <u>People v. Kipp</u>, 26 Cal. 4th 1100,

19  1130 (2001); <u>People v. Vera</u>, 15 Cal.4th 269, 275-76 (1997).  In <u>Rich v. Calderon</u>, 187 F.3d

20  1064, 1066 (9th Cir. 1999) and <u>Vansickel v. White</u>, 166 F.3d 953 (9th Cir. 1997), the Ninth

21  Circuit held that California's contemporaneous objection rule is an adequate and independent

22  state procedural rule when properly invoked by the state courts.  The Ninth Circuit has also

23  concluded that the contemporaneous objection rule has been consistently applied by the

24  California courts.  <u>See</u> <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1125 (9th Cir. 2002).  Here, the state

25  court noted that trial counsel was "well aware" that the Wellman report was belatedly disclosed,

26  and "could have objected" but "chose not to do so."  Based on these facts, the state court deemed

1  the instant claim procedurally barred.  Thus, on federal habeas review, the claim is procedurally

2  barred absent a showing of cause and prejudice.

3        The cause standard requires the petitioner to show that "some objective factor

4  external to the defense impeded counsel's efforts to construct or raise the claim."  McCleskey v.

5  Zant, 499 U.S. 467, 493 (1991) (internal quotations omitted).  A petitioner may also show cause

6  by establishing constitutionally ineffective assistance of counsel, but attorney error short of

7  constitutionally ineffective assistance of counsel does not constitute cause and will not excuse a

8  procedural default.  Id. at 494.  Petitioner asserts in a separate claim that his trial counsel

9  rendered ineffective assistance by failing to object to admission of the Wellman report.  As

10  discussed below, however, petitioner's counsel was not ineffective.  Nor has petitioner

11  demonstrated that failure to consider this claim will result in a fundamental miscarriage of

12  justice.  As petitioner has not shown cause and prejudice, his first Brady claim is procedurally

13  barred.

14        Even assuming arguendo that the claim is not barred, it lacks merit, as petitioner

15  has not shown that the late disclosure of the Wellman report rendered the verdict unworthy of

16  confidence.  As discussed further below, defense attorney Clark made efforts to discredit

17  Wellman and show that petitioner had an alibi during the morning of the shooting.  Petitioner has

18  not shown that, had Clark received the Wellman report a month earlier, he would have

19  fundamentally changed this strategy or uncovered new evidence that threw petitioner's guilty

20  verdict into doubt.  Absent a showing of prejudice under Brady, petitioner is not entitled to relief

21  on this claim.

22  2.  Coroner's Past Drug Abuse

23  a.  Claim

24        In his second Brady claim, petitioner contends that the prosecution withheld

25  material evidence concerning Dr. Curtis Rollins, the medical examiner who conducted the

26  victim's autopsy and offered key testimony about the time of death.  Petitioner asserts that by

September 30, 2002, the El Dorado County District Attorney's Office possessed documents detailing Dr. Rollins' drug abuse, criminal conviction, professional misconduct, and probation. (Ptn. at 71.)  These documents ("the Brady packet") included:

- A newspaper article dated March 22, 2001, which reported that in a search of Dr. Rollins' Arizona home that year, sheriff's detectives found "numerous bottles and containers of prescription-only drugs" including "narcotic painkillers" and drug paraphernalia.  The article further reported that investigators searched Rollins' office at the county morgue and found "morphine behind books on a bookshelf," which Rollins reportedly ordered and paid for them himself (Lod. Doc. 1, Clerk's Transcript ("CT") 2153-2154);

- Records from the superior court case of State of Arizona v. Rollins, documenting Rollins' December 2001 guilty plea to misdemeanor possession of drug paraphernalia and felony possession of narcotic drugs. (CT 2138-2142.)  On the felony count, the Arizona superior court deferred entry of the guilty plea for one year, after which the plea would be vacated if Rollins complied with all conditions of his probation (CT 2140);

- A minute order recording Rollins' January 30, 2002 sentence of one year of unsupervised probation (CT 2143-2145);

- The minutes from a March 6, 2002 meeting of the Arizona Board of Medical Examiners issuing Dr. Rollins a Letter of Reprimand, placing him on probation for five years subject to the Board's Monitored Aftercare program, and barring him prescribing, administering, or dispensing Schedule II controlled substances under his Arizona license until receiving the Board's permission to do so (CT 2149-2152); and

- A March 10, 2003 order in State of Arizona v. Rollins dismissing the

1    felony narcotics charge due to Rollins' successful completion of probation.

2    (CT 2146.)

3    As set forth below in the court of appeal's factual summary, these materials were

4    faxed to El Dorado County District Attorney Lacy in September 2002 at the behest of the Chief

5    Deputy District Attorney for Sacramento County, Cynthia Bessemer, who believed they were

6    Brady material that should be disclosed to the defense.  According to Bessemer, Lacy told her

7    that he did not consider the information to be Brady material.  (CT 1621-1623.)

8    Despite his office's receipt of these materials in September 2002, the prosecutor

9    in petitioner's case, Joseph Alexander, later stated he knew nothing about Rollins' history of

10   drug abuse until the morning Rollins was slated to testify at trial.  (CT 2422-2423.)  That

11   morning, following a brief evidentiary hearing outside the presence of the jury, the trial court

12   ruled that Rollins' past drug use would not be raised in front of the jury (CT 2425-2429), and

13   Rollins went on to testify about the victim's time of death.

14   Post-trial, petitioner's new defense counsel conducted additional discovery into

15   Rollins' history and filed motions to disqualify the trial judge from further participation in the

16   case, recuse the El Dorado County district attorney, and hold a new trial, as set forth below.

17   Petitioner contends that the prosecution's failure to disclose impeachment

18   evidence concerning Rollins prior to trial violated Brady.  "[T]he undisclosed materials

19   undermined the jury's ability to determine when the shooting occurred and, as a result, whether

20   O'Brien's alibi applied . . . undermin[ing] any confidence in the jury's verdict."  (Ptn. at 75-76.)

21   b.  State Court Opinion

22   In the last reasoned decision on this claim, the state court of appeal set forth the

23   relevant facts as follows:

24       Both defendants claim their convictions should be reversed
         because the prosecution failed to disclose allegedly material
25       information concerning the prosecution's pathologist, Dr. Rollins,
         and his history of abusing narcotic pain relievers. They claim the
26       information was material because they could have used it to

challenge Dr. Rollins's credibility and his opinion as to the time of death, thereby resulting in a reasonable probability of a different result. We disagree. The information was not material to this case.

A. *Additional background information*

1. *Disclosure at trial*

On the morning he was to testify at trial, Dr. Rollins testified at an Evidence Code section 402 hearing held in chambers. The prosecutor, Joseph Alexander, asked three questions:

"Q. Dr. Rollins, this morning you told me in my office that you have a prior history of drug abuse; is that correct?

"A. True.

"Q. And do you currently use or abuse narcotics?

"A. No.

"Q. How long has it been that you've been sober?

"A. March 18, 2001. It's coming up on three years." The prosecutor asked no further questions. FN20

FN20. In a March 2005 declaration, Alexander stated that he had no knowledge of Dr. Rollins's drug problem prior to that morning of trial.  He had spoken with Dr. Rollins by telephone and met with him in person, and on none of those occasions did Dr. Rollins disclose any prior drug problems or criminal actions as a result of those problems.  On the morning he was scheduled to testify, Dr. Rollins met with Alexander and asked him if he thought the defense would cross-examine him concerning his "<u>Brady</u>" history.  Alexander asked Dr. Rollins what he meant. Dr. Rollins told him he had a history of substance abuse. Alexander told Dr. Rollins he knew what "<u>Brady</u>" referred to, but he did not tell Dr. Rollins that he already knew about Dr. Rollins's "<u>Brady</u>" information or his "<u>Brady</u> packet."  Because they were due in court, Alexander did not question Dr. Rollins further.  Upon arriving at court, Alexander informed the trial judge and opposing counsel that a matter had come up that needed to be addressed outside the presence of the jury.  They met in chambers, where Alexander explained off the record his earlier conversation with Dr. Rollins. He said he did not know any details concerning Dr. Rollins's history of substance abuse, and he suggested they hold an evidentiary hearing on the record where defense counsel could examine Dr. Rollins on the information Dr. Rollins gave to Alexander that morning.

Under cross-examination, Dr. Rollins testified that his drug of choice was Demerol.  He had originally been working for

31

Sacramento County when he took a job as the chief medical coroner in a county in northern Arizona.  He completed a five-month in-house rehabilitation in Georgia, and he resigned his Arizona position upon completing his treatment.  He returned to Sacramento County.  In December 2001 he resumed his previous employment with the Sacramento County Coroner's office.

Dr. Rollins stated that as a condition of his current employment, he is subject to random urine tests once a week.  None of these tests have been positive since he resumed work for Sacramento County.

Neither the prosecution nor counsel for either defendant asked Dr. Rollins any further questions.

In light of the testimony, the trial court (Judge Proud) ruled that Rollins's history of drug abuse was not to be raised in front of the jury.  When asked if they had a problem with that ruling, both defense counsel replied they did not.

As discussed above, Dr. Rollins proceeded to testify as to the cause and time of death.  He placed the time of death at sometime between 10:30 a.m. and 12:30 a.m.  This evidence was significant.  No physical evidence directly placed O'Brien at the crime scene, and O'Brien, relying on prosecution witness testimony, proffered an alibi for his whereabouts the day of the murder up to 10:30 a.m. and after 11:25 a.m.  Dr. Rollins's opinion placed the time of death within the 55-minute gap in O'Brien's alibi defense.

2. *Posttrial discovery*

During an October 15, 2004, posttrial hearing, O'Brien's new defense attorney stated that Dr. Rollins had suffered "felony convictions" in Arizona.  Prosecuting attorney Alexander stated in a subsequent declaration that defense counsel's October 2004 statement was the first time he had heard that Dr. Rollins might have a criminal history.

After that hearing, Alexander did some more investigation, and he obtained from Dr. Rollins a number of documents regarding a criminal case in Arizona that had been prosecuted against him.  Alexander immediately faxed these documents to defense counsel on October 20, 2004. The documents included a December 2001 "Stipulated Guilty Plea" filed in Coconino County Superior Court, Arizona, by which Dr. Rollins pled guilty to possessing drug paraphernalia, a misdemeanor, and to possession or use of narcotic drugs, a felony.

Also included was a January 2002 minute order from the same Arizona court ruling on Dr. Rollins's plea. The court accepted Dr. Rollins's plea only as to the misdemeanor, but it adjudged him guilty of the pleaded crimes. For the misdemeanor count, the court

suspended imposition of sentence and placed Dr. Rollins on probation for one year. As to the felony count, the court stated it was "deferring acceptance of the plea agreement for a period of one year, giving [Dr. Rollins] time to complete the California Physician Diversion Program."

In response to this disclosure, O'Brien, on November 29, 2004, filed a motion for discovery. Among other items, he sought to obtain a list of all cases in which Dr. Rollins had been called as a prosecution witness by the El Dorado County District Attorney's office.

The prosecution opposed the motion for discovery. It asserted Dr. Rollins had not suffered a felony conviction; his misdemeanor conviction did not involve conduct amounting to moral turpitude; the People had not engaged in a pattern or practice of concealing Dr. Rollins's drug problems, and the evidence was not material.  It claimed the People were not aware of any felony or misdemeanor convictions against Dr. Rollins until defense counsel raised the issue in October 2004.

As part of its opposition to the discovery motion, the prosecution submitted an order issued by the Arizona court on March 10, 2003, dismissing Dr. Rollins's plea to the felony possession charge. In that order, the court noted it had deferred accepting the plea for one year, and that under the plea agreement, it was to dismiss the charge if Dr. Rollins complied with the terms of the California Medical Board's diversion program.  Dr. Rollins had complied. The court thus terminated his probation term, vacated the felony plea, and dismissed the felony charge with prejudice.

The trial court granted the request for discovery in part, including the request for the list of cases in which Dr. Rollins testified. According to the Attorney General, the prosecution informed the defendants of two such cases. One was a 1999 case entitled People v. Williams. The defense attorney in that case was Judge Proud, who at that time was in private practice.

3. *Motions to recuse trial court and district attorney*

Defense counsel asked Judge Proud to submit to an interview to determine whether he received materials on Dr. Rollins's criminal record from the district attorney's office during the 1999 Williams case.  The judge refused.  Defense counsel then filed a motion to disqualify Judge Proud from any further participation in this case.

In his verified answer to the motion, Judge Proud stated that when he was defense counsel in the Williams case, he had no knowledge of Dr. Rollins's criminal record.  He did not recall whether the issue of Dr. Rollins's substance abuse came up during the case.

33

The motion to recuse was heard in Placer County Superior Court, and that court denied the motion in February 2005.  However, in November 2005, our court issued a writ of mandate directing the trial court to grant O'Brien's motion to disqualify Judge Proud.  In April 2006, the presiding judge of the El Dorado Superior Court assigned all further matters in this case to Judge Phimister.

Meanwhile, in April 2005, O'Brien filed a motion to recuse prosecutor Alexander and the El Dorado County District Attorney's Office on the ground the prosecutor had failed to disclose Dr. Rollins's criminal history prior to trial.  To prove the district attorney had knowledge of Dr. Rollins's history prior to O'Brien's 2004 trial, O'Brien submitted into evidence documents faxed from the Sacramento County District Attorney's office to Gary Lacy, El Dorado County District Attorney. The fax was sent on September 30, 2002.  The documents included minutes from the Arizona Board of Medical Examiners' meeting of March 6, 2002, where that board placed Dr. Rollins on administrative probation for five years.  The fax also included news articles from the Arizona Daily Sun detailing Dr. Rollins's arrest and subsequent guilty plea.

After Judge Phimister took over the case in April 2006, O'Brien submitted additional evidence in support of his motion to recuse the district attorney.  He submitted a May 2006 declaration by Cynthia Besemer, Chief Deputy District Attorney for Sacramento County. She declared she instructed her secretary to fax the materials on Dr. Rollins to El Dorado County District Attorney Lacy in 2002.  Her office was familiar with Dr. Rollins and had opposed his rehiring by the Sacramento County Coroner.  Besemer received assurances from the Coroner that Dr. Rollins would not work on any coroner's case that could lead to criminal court proceedings.

Besemer said it was her office's practice to provide information to defense attorneys about Dr. Rollins's drug problems and criminal conviction in every case because it believed it constituted Brady material.

In 2002, she learned that the Sacramento County Coroner's Office contracted to perform autopsies for other counties, including Amador County and El Dorado County.  She was informed that Dr. Rollins would be performing autopsies in those counties that could lead to criminal proceedings. Thus, she faxed to the district attorneys in those counties the package of materials discussed above.

Besemer recalled speaking with Lacy by telephone before she faxed him the materials.  She did not recall the exact conversation, but her purpose was to inform Lacy of Dr. Rollins's situation so that Dr. Rollins's possible testimony would not damage Lacy's prosecutions.  FN21

FN21. Besemer spoke again with Lacy after she had given the same information on Dr. Rollins to O'Brien's defense attorney. She told Lacy she had to provide the documents to O'Brien because they were public. She had provided the same information to defense counsel in her cases where Dr. Rollins would testify. According to Besemer, Lacy stated it was not a problem because he did not consider the information to be <u>Brady</u> material.

In addition to the declaration by Besemer, O'Brien attached a declaration from Amador County District Attorney Todd Riebe as support for his motion to recuse.  Riebe declared that in September 2002, he received a telephone call from Sacramento County District Attorney Jan Scully informing him of Dr. Rollins's drug problems and his Arizona convictions.  He also received from her a fax with the same documents received that month by Lacy.

4. *Motion for new trial*

In July 2006, O'Brien filed his motion for new trial.  In addition to the grounds discussed above, one of the grounds for new trial was the prosecution's alleged <u>Brady</u> violation for not disclosing Dr. Rollins's criminal record.  In support of the motion, O'Brien included, among other documents, a December 2004 declaration by Dr. Rollins.  Dr. Rollins claimed that the morning he was to testify in trial, he informed prosecutor Alexander about his prior problems with Demerol and that he had been through rehabilitation. According to Dr. Rollins's declaration, Alexander stated he was aware that Dr. Rollins had a "<u>Brady</u> package," and he suggested they have a discussion with opposing counsel and the judge about it on the record.

 O'Brien also submitted a transcript from a 2002 Alameda County Superior Court trial, <u>People v. Daveggio and Michaud</u>, in which Dr. Rollins testified as a witness. Under voir dire, Dr. Rollins admitted he had recently concluded he was addicted to Demerol. He began using Demerol without a prescription in 1988, although he had experimented with other drugs.
Dr. Rollins generally would use drugs one to three times a year, taking, as he called it, a "mini vacation" when he did not have any tests or exams pending and was at home isolated from other people.  He would use drugs that he had bought and paid for himself through the coroner's office. He would place them in a location he was allowed to have them under his certificate from the federal Drug Enforcement Authority.  When he would use the drugs, he would simply remove them from his stock and administer them to himself.

Dr. Rollins first sought treatment for his addiction in 1998.  At that time, he had been in a long-term romantic relationship, and when he realized the relationship would end, he overdosed on the drug, nearly killing himself.  After treatment, he was free of Demerol for

35

about a year and a half, until around 2000.  He relapsed for a week after deciding to leave Sacramento and look for another job.

The next, and last, time Dr. Rollins improperly used Demerol was in January 2001 in Arizona. He entered a treatment program in Georgia for five months. After completing the treatment, he was indicted by a grand jury and he entered his plea. He voluntarily joined a diversion program for a year, which included group therapy meetings twice a week. FN22

FN22. Following Dr. Rollins's testimony, the Alameda County court accepted Dr. Rollins as an expert in the area of forensic pathology.

The prosecutor opposed O'Brien's motion for new trial. He did not dispute that the information on Dr. Rollins's criminal background should have been given to the defense prior to trial. He argued, however, that the failure to disclose did not deny O'Brien a fair trial. The criminal information was not material because it would allow impeachment on only a collateral issue.  As it was, Dr. Rollins testimony at trial was a "serious blow" to the People's case. He testified the time of death was between 10:30 a.m. and 12:30 p.m., but was likely closer to 12:30 p.m. O'Brien had an "undisputed alibi for his whereabouts from 11:30 a.m. until after the victim's body was discovered."

Dr. Rollins's criminal history, the prosecution argued, did not call into question the validity of Dr. Rollins's expert opinion on the time of death.  However, the prosecutor acknowledged the evidence concerning Dr. Rollins was not adequately investigated or provided to the defense prior to trial.

5. *Trial court's rulings*

The trial court held a hearing on both the motion to recuse the prosecutor and his office and the motion for new trial. At the hearing, the prosecutor stated the People were not contesting whether Besemer had a phone conversation with Lacy or that she faxed documents concerning Dr. Rollins to Lacy.  Lacy claimed he did not recall receiving them, but the fax number on the cover page was the number for the fax machine that sits next to his desk.

The trial court denied the motion to recuse the prosecutor or his office, concluding no <u>Brady</u> violation occurred because the withheld information was not admissible.  It noted Dr. Rollins's criminal information was in the prosecution's possession prior to trial.  However, Dr. Rollins's only conviction in Arizona was for a misdemeanor. There was no felony conviction because the Arizona court never accepted the plea agreement as to the felony plea, it deferred entry of the plea, and it ultimately dismissed that charge with prejudice. And, the court determined, the charged crimes,

whether felony or misdemeanor, did not involve moral turpitude.

The court also determined Dr. Rollins was not on probation at the time of the autopsy. Even though he had not yet petitioned the Arizona court to set aside his plea, his one-year probationary period had expired by the time he performed the autopsy.

The court stated the question before it was whether the district attorney's office should be recused for not providing sufficient information to allow the defense to examine Dr. Rollins on his past drug use and what effect, if any, it had on his ability to perform the autopsy. It concluded the in-trial disclosure was sufficient to enable the defense to question Dr. Rollins on his ability to perform. It believed Judge Proud would have denied admission of the Arizona court history under Evidence Code section 352. The district attorney's office could have done better handling discovery in this case, but its actions did not warrant recusal.

The trial court also denied the motion for new trial. When it did so, the court again addressed the <u>Brady</u> issue. It noted that all violations of <u>Brady</u> do not automatically result in a verdict being set aside. A reversible violation must concern evidence that was material. Here, the evidence of Dr. Rollins's Arizona criminal case was not admissible, and thus not material, because there was no felony conviction that could be used for impeachment purposes and probation had terminated.

The court stated materiality was limited to whether Dr. Rollins, a former addict, was under the influence of a controlled substance when he performed the autopsy or formed his opinions. That issue was reviewed in the Evidence Code section 402 hearing at trial. The Arizona information would have allowed the defense only to ask additional questions about Dr. Rollins's drug use. It would not have established that Dr. Rollins was under the influence of drugs at the time he performed his autopsy or formed his opinions in this case. It would have established only that he had been addicted to Demerol at one time, had been in treatment, and had tested regularly without positive test results.

"So if there's a <u>Brady</u> issue," the court said, "the <u>Brady</u> issue was resolved based upon this Court's finding that the evidence - the additional information, while possibly material, would only have been used to be cumulative to further evaluate the ability of Dr. Rollins to perform his examination of the decedent." Knowledge of the evidence would not have changed the case, the court concluded, "in that it is significantly inadmissible, and at best would go to the issue of cumulative evidence."

<u>People v. O'Brien</u>, 2008 WL 2955548, **25-30.

Applying the Brady doctrine to these facts, the state court of appeal continued:

B. *Analysis*

In a Brady claim, conclusions of law or of mixed questions of law and fact, such as the elements of a Brady claim, are subject to independent review. Findings of fact are entitled to great weight when supported by substantial evidence. (People v. Salazar (2005) 35 Cal.4th 1031, 1042, 29 Cal.Rptr.3d 16, 112 P.3d 14.)

"In Brady, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' ( Brady, supra, 373 U.S. at p. 87 .) The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused (United States v. Agurs (1976) 427 U.S. 97, 107), that the duty encompasses impeachment evidence as well as exculpatory evidence (United States v. Bagley (1985) 473 U.S. 667, 676), and that the duty extends even to evidence known only to police investigators and not to the prosecutor (Kyles v. Whitley (1995) 514 U.S. 419, 438).  Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' (Id. at p. 433.)  In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' (Kyles, supra, 514 U.S. at p. 437; [citations omitted].)

" '[T]he term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence - that is, to any suppression of so-called "Brady material" - although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (Strickler v. Greene (1999) 527 U.S. 263, 281-282, fn. omitted.) Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' (United States v. Agurs, supra, 427 U.S. at p. 112, fn. 20; accord, U.S. v. Fallon (7th Cir.2003) 348 F.3d 248, 252.) Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible (cf. Wood v. Bartholomew (1995) 516 U.S. 1, 2 [133 L.Ed.2d 1] ), that the absence of the suppressed evidence made conviction 'more likely' (Strickler, supra, 527 U.S. at p. 289), or that using the suppressed

evidence to discredit a witness's testimony 'might have changed the outcome of the trial' (ibid.).  A defendant instead 'must show a "reasonable probability of a different result." ' ( Banks v. Dretke (2004) 540 U.S. 668, 699.)" [Citation.]

"Evidence would have been material only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different. The requisite reasonable probability is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court. It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]"  (People v. Dickey (2005) 35 Cal.4th 884, 907-908, original italics.)

There is no dispute that Lacy, the district attorney, had a duty to inform his deputies of what he knew about Dr. Rollins, or that the prosecutor had an obligation to learn of any evidence known by Dr. Rollins that would be favorable to the defense.  Dr. Rollins was acting on the government's behalf in this case, and information regarding his prior drug abuse was potentially favorable to the defense as impeachment evidence. The district attorney had a duty to investigate and learn all he could about this evidence so he could determine how to comply with his Brady obligations.  In this case, the district attorney had actual knowledge, and he downplayed and disregarded it for whatever reason. He and his office did not fulfill their responsibility here. Their failure to do so, however, while it casts them in a bad light, does not end our discussion.

To establish a violation of Brady, the defendants still had to show that the nondisclosed information was material, i.e., had the information been disclosed to the defense, there is a reasonable probability of a different result.  Defendants fail to make that showing. The result would not have changed because much of the evidence was inadmissible as impeachment evidence. That which was admissible would not have led to a different outcome. Moreover, disclosure would not have altered, indeed, it did not alter, the defendants' trial strategies.

The Arizona misdemeanor conviction was not admissible. Misdemeanor convictions are not admissible in California. (People v. Wheeler (1992) 4 Cal.4th 284, 296.)  Conduct amounting to a misdemeanor is admissible subject to the relevance requirement of moral turpitude. (Ibid.) Possession of narcotic paraphernalia, however, is not an act of moral turpitude. (People v. Cloyd (1997) 54 Cal.App.4th 1402, 1409.)  Defendants would not have been allowed to impeach Dr. Rollins with the misdemeanor evidence.

The conditional Arizona felony possession plea was not admissible because it did not result in a conviction, had been dismissed due to the condition occurring, and, in any event, did not involve moral

turpitude. The Arizona court never accepted Dr. Rollins's plea, and it ultimately dismissed the felony charge with prejudice. In short, there was no felony conviction and no admissible misdemeanor conviction to introduce for impeachment purposes. And, standing alone, Dr. Rollins's conduct of being addicted and unlawfully possessing narcotics were not acts of moral turpitude. (People v. Castro (1985) 38 Cal.3d 301, 317.) Thus, this conduct was not admissible for impeachment purposes.

Defendants claim Dr. Rollins's testimony in the Alameda County case, where he gave a history of his drug abuse and explained how he obtained the drugs, shows that Dr. Rollins lacked judgment and engaged in dishonest conduct.  However, narcotic addiction not related to the specific autopsy or to the period of time of observation of the pertinent facts or testimony is not admissible without expert testimony showing a detrimental effect on the witness's abilities. (People v. Pargo (1966) 241 Cal.App.2d 594; People v. Bell (1955) 138 Cal.App.2d 7.)  "[S]uch evidence is inadmissible unless testimony of the use of heroin or any other drug tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics." (People v. Hernandez (1976) 63 Cal.App.3d 393, 405.)

Defendants made no offer of proof showing Dr. Rollins was under the influence of drugs while he examined the victim, performed the autopsy, prepared his report, or testified at trial. They also offered no expert testimony showing Dr. Rollins's past drug abuse somehow affected his ability to make honest medical judgments and observations when he was called upon to do so in this case. Thus, the additional evidence of Rollins's drug use would not be admitted for impeachment purposes.

Even if Dr. Rollins's testimony as to how he obtained the drugs had been admissible, it would still fail the materiality requirement. Dr. Rollins explained in his Alameda County testimony that he purchased the drugs through the coroner's office, stored them there in an authorized storage location, and used them without a prescription. For purposes of argument only, we assume Dr. Rollins's abuse of his medical credentials and the county coroner's office indicates a character trait of dishonesty and moral turpitude.

Disclosure of this information and impeachment of Dr. Rollins with it, however, would not have created a reasonable probability of a different outcome. When we consider this evidence in conjunction with all of the evidence in this case, our confidence in the verdict is not undermined.

First, it is doubtful the evidence would have undermined the jury's belief in Dr. Rollins's testimony of the time of death. Dr. Rollins

had no motive to lie about the time the victim died, and, indeed, the estimated time frame of death included times when O'Brien claimed to have an alibi. Nothing in the record suggests any reason why Dr. Rollins would fabricate the time of death.

Second, the incriminating evidence in the record is overwhelming. Defendant Dickson testified that he, Wellman, and O'Brien, who was armed with a shot-gun, drove to the Treasure Lane home to get drugs, dirt bikes and cash. They stopped at the Big Horn Gun Shop along the way and acquired shotgun shells. He and Wellman ran out of the house when O'Brien and the victim were pointing guns at each other. O'Brien exited the house carrying the shotgun and told them the victim was dead. They threw the victim's rifle into a pond. Dickson later showed law enforcement officers where they had disposed of the victim's rifle, and the rifle was later retrieved from that location. Dickson's testimony corroborated the major points of Wellman's testimony.

Even without Dr. Rollins's testimony, there remains a 55-minute gap that O'Brien cannot fill with the testimony in the record. The time estimates given by the witnesses, the experimental evidence of the time to make the route likely used by the defendants, and the lack of an alibi for those 55 minutes are sufficient grounds to support the verdict. Testimony as to how Dr. Rollins obtained narcotics two years earlier would not have undermined this evidence.

Dickson additionally complains that had the evidence of Dr. Rollins's prior drug use been disclosed, he likely would not have testified on his own behalf.  But, as already explained, most of the nondisclosed evidence was inadmissible, and the disclosed evidence was ruled inadmissible. We doubt Dickson's decision to testify would have changed had he known about the manner in which Dr. Rollins obtained his drugs two years previously, as that information had little bearing on the credibility of Dr. Rollins's time-of-death assessment here. FN23

FN23. Our confidence in the verdict is further strengthened by Dr. Herrmann's substantial corroboration of Dr. Rollins's estimated time of death.

We thus conclude defendants have not satisfied their burden of establishing materiality in order to prove a Brady violation. As a result, the trial court did not err in denying a new trial on this basis.

People v. O'Brien, 2008 WL 2955548, **30-33.

/////

/////

41

1  c. Discussion

2          The state court of appeal concluded that district attorney's office did not fulfill its

3  responsibility to disclose the Brady material to the defense prior to trial.  However, it further held

4  that, under California law, the following evidence was not admissible for purposes of

5  impeachment: Rollins' Arizona misdemeanor conviction; his conditional plea to felony

6  possession (which was ultimately dismissed); and his past drug addiction, which did not concern

7  the period of time when Rollins was determining the cause and timing of Smelser's death.  See

8  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (Supreme Court "has repeatedly held that a state

9  court's interpretation of state law, including one announced on direct appeal of the challenged

10 conviction, binds a federal court sitting in habeas corpus.").  As the jury would not have heard

11 this evidence in any event, the state court reasoned, it cannot be considered material for purposes

12 of Brady.

13         Circuit courts maintain competing views as to whether inadmissible evidence is

14 automatically barred from being considered material under Brady.  Paradis v. Arave, 240 F.3d

15 1169, 1178 (9th Cir. 2001) ("There is no uniform approach in the federal courts to the treatment

16 of inadmissible evidence as the basis for Brady claims.").  In the Eleventh Circuit, inadmissable

17 evidence can be considered material for Brady purposes if it could lead to other potentially

18 exculpatory evidence.  Wright v. Hopper, 169 F.3d 695, 703 n. 1 (11th Cir. 1999).  The Fourth

19 Circuit considers all inadmissible evidence automatically immaterial for the purposes of a Brady

20 claim.  Hoke v. Netherland, 92 F.3d 1350, 1355 n. 3 (4th Cir.1996).  The Ninth Circuit is

21 unsettled on the subject.  See Paradis, 240 F.3d at 1178 ("It appears that [Ninth Circuit] law on

22 this issue is not entirely consistent. . . . The instant case does not require resolution of that

23 possible conflict[.]").  When Supreme Court precedent does not answer a particular question, a

24 state court's decision is not an unreasonable application of "clearly established" federal law

25 under AEDPA.  Ponce v. Felker, 606 F.3d 596, 604 (9th Cir. 2010) (quoting Wright v. Van

26 Patten, 552 U.S. 120, 126 (2008)).  In this case, therefore, the state court of appeal's assumption

1  that inadmissible evidence is not material for purposes of a <u>Brady</u> claim is a reasonable

2  interpretation of Supreme Court precedent under AEDPA.

3       In his traverse, petitioner argues that, regardless of whether Rollins' criminal

4  record of pleading guilty to a misdemeanor and conditional felony were admissible, "the criminal

5  conduct underlying" these convictions "was admissible because it showed that Dr. Rollins lacked

6  professional judgment, thus calling into question his opinion on the time of death." (ECF No. 23

7  at 19.)  Such conduct encompasses more than Rollins' past addiction, petitioner argues, and

8  includes Rollins' misuse of his medical credentials to order Demerol for personal use and the fact

9  that he was on criminal probation with a pending felony charge at the time he conducted

10  Smelser's autopsy in February 2003.  (<u>Id</u>. at 19-22.)

11       Even assuming these underlying facts were admissible, however, petitioner's

12  argument that they would have caused the jury to doubt Rollins' opinion as to time of death is

13  purely speculative.  Rollins' past drug-related conduct, however immoral and even criminal, does

14  not suggest he could not competently perform an autopsy in the course of his work in February

15  2003.  Nor does it suggest any reason for Rollins to misrepresent the time of Smelser's death.  As

16  the state court reasonably determined that petitioner did not carry his burden to establish

17  materiality under <u>Brady</u>, petitioner is not entitled to habeas relief on this claim.

18  B.  <u>Lack of Notice</u>

19       Petitioner next claims that the prosecution failed to give him adequate notice of

20  the "nature and cause of the accusation" in violation of the Sixth Amendment.  (Ptn. at 77.)  As

21  in his first <u>Brady</u> claim, petitioner's allegations concern the late disclosure of the January 2004

22  Wellman interview, in which Wellman changed his story about the timing of events.

23       "More than three months prior to trial, [defense counsel Clark] informed the court

24  and prosecutor in writing that O'Brien would assert an alibi defense at trial," petitioner asserts.

25  (<u>Id</u>. at 77-78.)  Between July 2003 and February 3, 2004, the prosecution maintained that the

26  shooting took place after 11:30 a.m., and Clark prepared an alibi defense on this basis.  The

prosecution waited a full month after the Wellman interview, until the day of trial, to disclose

their new theory that the shooting took place between 10:30 and 11:30 a.m.  "This sudden shift in

the alleged time of the commission of the offense deprived O'Brien of adequate notice of the

'nature and cause of the accusation' and due process of law," depriving petitioner of a fair trial,

petitioner asserts.  He argues that he was "severely prejudiced" by the lack of notice.  (Id. at 77-

81.)

   In the last reasoned decision on this claim, the El Dorado County Superior Court

wrote:

> In his second claim, Petitioner asserts that he was severely
> prejudiced by the Respondent's belated February 4th disclosure of
> the aforementioned interview of William Wellman.
>
> As with Claim One, trial counsel was well aware that he received
> discovery of Wellman's statement the day after jury selection
> started, and six days before the jury was sworn in.  Counsel,
> however, made a strategic decision not to object and/or seek a
> continuance.  For the reasons addressed in Section One, the court
> must also reject Petitioner's second ground for relief.

(Sup. Ct. Op.  at 4.)

   As with petitioner's first Brady claim, the state courts concluded that petitioner's

"lack of notice" claim was barred due to defense counsel's failure to object at trial.  For the

reasons set forth above, the court finds this claim procedurally barred.

C.  Obstruction of Justice

   Petitioner next claims that the prosecutor (Joseph Alexander), counsel for William

Wellman (Mark Ralphs), Detective Tom Hoagland, and Wellman conspired to obstruct justice,

depriving petitioner of due process and a fair trial.  As set forth above, Detective Hoagland

conducted a January 2, 2004 interview with Wellman, the report of which was disclosed to

defense counsel the day after trial started.  At trial, Wellman testified that he changed his account

of the timing of the shooting at his January 2 meeting with Alexander, Hoagland, and Ralphs.

He testified that his story changed because he had been in custody for almost a year and "had

some time to think and ponder what happened." (RT 457-464.)  Wellman further testified that

neither Hoagland nor anyone from the district attorney's office had asked him to change his

testimony. (RT 420.)  Detective Hoagland testified that, during the course of the January 2

meeting, Wellman revealed "new facts" about the shooting, including that "he felt the time frame

was different than the first two [pretrial] interviews."  (RT 1387-1388.)

Petitioner asserts that both Wellman and Hoagland committed perjury.  He alleges

that (1) Alexander coerced Wellman  into changing the timing of the shooting because he knew

that petitioner had an alibi if the shooting occurred after 11:30 a.m. (Ptn. at 86); (2) Ralphs met

with Wellman in his cell a few days after the January 2, 2004 interview and told him that the

time frame he had previously given to police was 'off,' as it did not match up with other evidence

about the time of death (id. at 88); (3) Wellman and Ralphs "agreed that Wellman would testify

that the shooting took place at the time Alexander wanted" because if there was no conviction,

Wellman would not get the benefit of his plea bargain and face the death penalty (id. at 86); and

(4) Hoagland's report of the January 2 interview with Wellman falsely indicated that Wellman

changed his story at the interview, not days later at the behest of his attorney (id. at 92-93).

Four years after the trial, on July 30, 2008, an investigator hired by petitioner

interviewed Wellman in prison.  (See Lod. Doc. 11, Exhibits at 189-203 (transcript of

interview).)  The state court discusses its contents in its factual summary, below.

In the last reasoned decision on this claim, the El Dorado County Superior Court

wrote:

> Petitioner alleges that the prosecutor, witness Wellman's attorney,
> and a detective all conspired to successfully convince Wellman to
> commit perjury at Petitioner's trial.  The primary basis for this very
> serious allegation is the transcript of a July 30, 2008 recorded
> telephone conversation between Wellman and defense investigator
> Gale Kissin.
>
> Other than this recorded telephone conversation, Petitioner adds
> little of evidentiary value to support his claim.  Essentially, he
> claims that because Wellman changed the time of the murder only
> after conferring with his three alleged co-conspirators, and because

45

of Wellman's July 30, 2008, statement to Petitioner's investigator, the only reasonable explanation is that the three alleged conspirators in fact successfully convinced Wellman to lie about the time of the murder.

To prevail, Petitioner must establish not only that Wellman's testimony was perjured, but also that this allegedly perjured testimony may have affected the outcome of the trial. In re Wright, 78 Cal. App. 3d 788, 807-808 (1978). The Petitioner fails on both counts.

A reading of the transcript of the interview discloses absolutely nothing which could cause a reasonable person to conclude that the prosecutor, Wellman's attorney, Wellman, and the detective conspired to suborn perjury. In fact, a reading of the transcript conveys quite the opposite impression. Wellman stated on no less than four occasions that the prosecutor and/or his counsel informed him that he had to be honest. Petitioner's Exhibits, page 191, lines 18-20; page 192, lines 2-4; page 195, lines 23-27; page 199, line 8.

In the statement at issue, Wellman further stated that no one coerced him into saying anything. Petitioner's Exhibits, page 200, lines 6-10. Further, Wellman informed the Petitioner's investigator that he was unsure of his initial statement, and provided explanations as to why the initial statement was not accurate. Petitioner's Exhibits, page 195, lines 6-8; page 196, lines 20-24; page 197, lines 22-30. [FN 6]

[FN 6: While Petitioner directly accuses Wellman's counsel, and other, of conspiring to suborn perjury, Wellman's counsel more subtly accuses Petitioner's counsel of misconduct. In a letter written to one of Petitioner's counsel dated October 21, 2008, Wellman's counsel noted that "you are one of the attorneys that sent an investigator to speak with my client, William Wellman, while we were pending sentencing, without my knowledge or consent." Petitioner's Exhibits, page 294.

The court, of course, did not know whether the allegation in this letter is true. If it is, however, this action was clearly improper. The court makes this observation primarily because Petitioner's counsel has directly made some very serious, but not very convincing, allegations against four individuals. If, in fact, Petitioner's counsel improperly sent an investigator to speak with Wellman before sentencing, he might be wise to tone down his essentially unsubstantiated allegations.]

The court is convinced that if Petitioner's jury had been able to hear the recorded conversation at issue, it would not have made any difference to the outcome of the trial. The jury would not have concluded that there was a conspiracy to commit perjury, and the content of the conversation would not have prevented the

1    defendant's conviction. [FN 7]

2    [FN 7: The court does not know whether the prosecution team and
     Wellman's attorney recontacted and reinterviewed Wellman in the
3    manner described in Wellman's July 30, 2008, interview with
     investigator Kissin.  But, if Wellman's description of events is
4    accurate, the reinterviewing of Wellman was not done in textbook
     fashion.  Nevertheless, it in no way constituted the suborning of
5    perjury.]

6    (Lod. Doc. 4 at 4-6.)

7           Habeas relief is appropriate if a petitioner can establish that a prosecutor

8    knowingly used false evidence to obtain the conviction.  Napue v. Illinois, 360 U.S. 264, 269

9    (1959); Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005).  Under Napue, "the knowing use of

10   false testimony to obtain a conviction violates due process regardless of whether the prosecutor

11   solicited the false testimony or merely allowed it to go uncorrected when it appeared."  United

12   States v. Bagley, 473 U.S. 667, 679, n.8 (1985).  If the false evidence is material — that is,

13   reasonably likely to have affected the judgment of the jury — the defendant's conviction must be

14   reversed.  United States v. Agurs, 427 U.S. 97, 103 (1976) ("[A] conviction obtained by the

15   knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any

16   reasonable likelihood that the false testimony could have affected the judgment of the jury.").

17          A petitioner seeking relief on this ground must show not only that the witness

18   testified falsely, but also that the prosecution knew the witness testified falsely.  Murtishaw v.

19   Woodford, 255 F.3d 926, 959 (9th Cir. 2001).  A petitioner must point to something in the

20   prosecutor's questioning, or the answers given, that may be construed to reflect an intention by

21   the prosecutor to mislead the jury.  United States v. Etsitty, 130 F.3d 420, 424 (9th Cir. 1997).

22   The fact that witnesses gave inconsistent or conflicting testimony does not establish that such

23   testimony was false.  United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997).  Rather,

24   "[d]iscrepancies in testimony . . . could as easily flow from errors in recollection as from lies."

25   United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995).

26   /////

1          Having reviewed the relevant record materials, including Wellman's July 2008

2  interview with a defense investigator, the undersigned concludes that the state court reasonably

3  determined that petitioner did not establish a conspiracy to present false evidence.  Rather, as set

4  forth in the state court's factual findings, Wellman repeatedly told the investigator in July 2008

5  that the prosecutor and his attorney encouraged him to be honest.

6          Wellman told the defense investigator that, prior to January 2, 2004, the issue of

7  Wellman's account of the timing of events "never came up" in discussions with his attorney.

8  (Lod. Doc. 11, Exhibits at 200-201.)  At the January 2 interview, the prosecutor mentioned the

9  timing discrepancy in Wellman's previous and current statements, and Wellman declined to

10  discuss it because he wanted to confer with his attorney first.  (Lod. Doc. 11, Exhibits at 194.)

11  Three or four days later, Wellman met with his attorney and

12          had a few questions about, um, what he thought I should do.  Um,
basically his reply was that he wanted me to do what I thought best

13          and, you know, to be completely honest, which I was.  Um, that was
nothing less than expected.

14

15  (Id. at 197.)  Wellman's attorney told him that his previous account of the timing was "not in

16  accordance" with certain evidence of the time of death.  (Id. at 199.)

17          [Defense investigator:] [D]id he say you better go think about it or
[the] plea agreement is in jeopardy if you don't get it right, or

18          anything like that?

19          Wellman: No.  He – he just wanted to make sure that – that I knew
what I was going into, you know. . . . There was nothing that –

20          nobody coerced me into saying anything.  Nothing was laid on me,
you know.  On my part, everything was straight up.

21

22  (Id. at 200.)  As to his different versions of the timing, Wellman told the investigator that "human

23  error" caused him to "fumble at the time."  (Id.)

24          Based on the record, the superior court reasonably found that petitioner failed to

25  show that Wellman's testimony was false or that the prosecutor, detective, and defense attorney

26  conspired with Wellman to suborne perjury.  In denying this claim, the state court reasonably

1  applied <u>Napue</u>,  Thus petitioner is not entitled to federal habeas relief on this basis.

2  D.  <u>False Evidence</u>

3              Petitioner next claims that the prosecution obstructed justice and denied him due

4  process because "prosecution witness Chantelle Michaud's testimony at trial was to a large extent

5  manufactured by the prosecution . . . and constituted false evidence." (Ptn. at 95.)  As recounted

6  in the factual summary of the offense, above, Michaud was a sixteen-year-old friend of O'Brien

7  who spoke to him at 10:30 on the morning of Smelser's killing, later that evening, and the next

8  day after seeing a report about the shooting on evening news.

9              Petitioner asserts that, in interviews with Michaud in the week after Smelser's

10  death, "detectives repeatedly turned off the tape recorder and 'more or less' told her what to say

11  about her conversations with O'Brien when the tape recorder was turned back on."  At trial, when

12  Michaud "stated she could not recall many aspects of her conversations with O'Brien . . . the

13  prosecutor read to the jury those portions of Michaud's interview when she was merely repeating

14  what the detectives told her when the tape recorder was turned off.  In this manner the prosecutor

15  was able to place before the jury, not what Michaud actually recalled of her conversations with

16  O'Brien, but what the detectives had told her to say[,]" most of which was false.  (Ptn. at 95-96.)

17  Petitioner further asserts that Michaud lied to detectives in order to protect her close friend

18  Dickson, and that the detectives lied to Michaud.

19              In the last reasoned decision on this claim, the El Dorado County Superior Court

20  wrote:

21              Petitioner seeks relief on the ground that the prosecution
              manufactured false testimony from witness Chantelle Michaud.
22              And, while she was being manipulated, Petitioner asserts that
              Michaud simultaneously manipulated the same detectives who were
23              interviewing her.

24              Petitioner claims that Michaud was manipulated when the
              detectives allegedly lied to her when they interviewed her.
25              Additionally, the detectives turned the recorder off and on during
              the interviews.  And, when Michaud testified at trial that she did not
26              remember parts of her interviews with detectives, the prosecutor

49

would introduce the statements she had previously made to detectives.

Conversely, Petitioner also claims that "[w]hile the detectives manipulated Michaud during her interviews, she also manipulated the detectives.  She told the detectives what they wanted to hear and not the truth because she wanted to point the finger of suspicion at Sean O'Brien and not Tyler Dickson."  Petition at page 79.

Petitioner's claim that Mauchaud [sic] manipulated two detectives at the same time that they were manipulating her is indeed interesting.  But, it does not support her [sic] claim for relief.  While Petitioner alleges that detectives lied to Machaud [sic] when they interviewed her, they fail to recognize that detectives are not prohibited from lying to witnesses or defendants they are interviewing.  Likewise, while it may not be the best practice in some instances, Petitioner fails to establish that turning a tape recorder off during portions of an interview can sustain habeas relief.

And, while Petitioner criticizes the prosecutor for introducing Michaud's prior recorded statements after she testified that she did not remember her prior statements, said practice is in conformity with the introduction of prior inconsistent statements pursuant to Evidence Code Section 1235.

Additionally, Petitioner's claim that Machaud [sic] manipulated the detectives by directing their attention towards him, and away from Dickson, seems unlikely.  It is clear that at trial, Machaud was a reluctant witness who repeatedly refused to offer testimony which would have been detrimental to petitioner.

Further, Petitioner is not claiming that Machaud perjured herself at trial.  Rather, he is claiming that she gave false statements to the police which were introduced at trial as prior inconsistent statements.  As Petitioner does not claim that Machaud's trial testimony was perjured, it will not for the basis of habeas relief.  Trial counsel had discovery of Machaud's statements, interviewed her prior to trial, and had the opportunity to cross-examine her at trial.  Whether or not Machaud's out-of-court statements were true or false was an issue for the jury to decide.

And finally, Petitioner has failed to demonstrate that the outcome of the trial may have been different if Machaud had given "truthful" pretrial statements to the police.

(Sup. Ct. Op. at 6-8.)

The court has reviewed the relevant record materials, including transcripts of

Michaud's March 4 and March 5, 2003 interviews with detectives (CT 2040-2080), Michaud's

1   trial testimony (RT 558-594), and an October 2005 interview that petitioner's counsel and a

2   defense investigator conducted with Michaud (Lod. Doc. 11, Exhibits at 204-265).

3             The basis for the instant claim is the October 2005 interview, in which Michaud

4   was pressed to recall her conversations with petitioner in February 2003 and her subsequent

5   statements to police detectives.  In that interview, Michaud stated: "They [the detectives] would

6   stop the tape and they would talk to me.  And then they would start the tape again."  (Lod. Doc.

7   11, Exhibits at 210.)

8             DN[9]: What would they say when they turned it off?

9             CHANTELL: I don't remember.

10            DN: Why?

11            CHANTELL: I don't know if it's cause my little cousin was in the
              background.  I know they turned if off once or twice because like
12            the phone rang or something, little things.  I don't exactly remember
              what was going on at the time.  I was kinda like in shock because
13            they were at my house.

14   (Id. at 214.)

15            Later in the interview, petitioner's counsel and Michaud had the following

16   exchanges:

17            DN: You testified to 6:00 or 7:00 [as the time when Michaud and
              petitioner spoke on the evening of the shooting].
18
              CHANTELL: Because that's what the detectives convinced me it
19            was.  I don't know, because I told them I didn't know and they're
              like, well, it was around 6 or 7.
20
              DN: Why would they say that?
21
              CHANTELL: I don't know.  I didn't know what time.  I don't pay
22            attention to what time I'm on the phone.
              . . .
23
              DN: Let's forget what the detectives said.  Let's first of all –
24
              CHANTELL: It's kind of hard since most of the stuff I know is
25

26            [9] Petitioner's current counsel, David Nickerson.

1   what they told me.

2   DN: [B]ack to what Hoagland said, how did it get to be 6 or 6:30?

3   CHANTELL: I don't know.  Like they were pressuring me, what
    time, what time, what time?  I'm like I don't know.  And somehow
4   6:00 and 7:00 was thrown in.  I didn't know.  I didn't remember
    what time I talked to him.

5
    . . .
6
7   CHANTELL: I'm very confused, because now it's like I don't
    remember that much even what was said between me and Sean
    because the detectives more or less told me what was said. . . . The
8   cops said a lot of things to me.

9   (Id. at 228, 231, 254.)  The instant claim is based on Michaud's statements to petitioner's counsel

10  in October 2005 that much of what she told police in March 2003, days after the shooting, was

11  suggested to her by the police themselves.

12          Michaud's October 2005 characterization of her March 2003 interviews with

13  police is not very credible, however.  First, it is apparent from the transcript that, by October 2005,

14  her memory was fuzzy about events that occurred two and a half years earlier.[10]  Second,

15  transcripts of the March 2003 police interviews with Michaud do not suggest that the police were

16  pressuring her to give certain answers.  When asked "what time of day" she spoke to petitioner on

17  the day of the shooting, for example, Michaud stated that she spoke with him at "like 10:30 in the

18  morning.  And then, I talked to him, like 6:00, 7:00 that night."  (CT 2041.)  This does not

19  comport with her later statement that she told police she "didn't know" and they suggested that

20  the conversation occurred at 6:00 or 7:00.

21          Moreover, Michaud gave innocuous reasons for the police stopping the tape –

22  because her six-year-old cousin was present and making background noises, or "once or twice"

23
    ───────────────────
24          [10] For example, when defense counsel asked Michaud how she knew she spoke with
    petitioner at 10:30 on the morning of the shooting, she replied that she did not know.  When
25  pressed, she stated: "I don't know, it was 2 ½ years ago."  She then explained," I guess it was just
    'cuz it was – I don't know.  I wasn't in school then.  I guess that's the time I normally woke up.  I
26  have no idea.  It was two years ago."  Michaud also did not remember if she called petitioner or if
    he called her.  (Lod. Doc. 11, Exhibits at 210.)

1  because the phone rang.  These statements are at odds with petitioner's theory that the detectives

2  stopped the tape in order to surreptitiously feed her information.

3           At trial, Michaud testified that she did her best to tell detectives the truth during

4  her interviews with them.  (RT 562, 572.)  She also testified that, when she talked to detectives

5  days after her conversations with petitioner, the timing of those conversations was "clearer in

6  [her] head" than at trial.  (RT 562.)  When Michaud claimed she could not recall specific facts

7  about her conversations with petitioner, the prosecutor impeached her testimony with her prior

8  statements to detectives pursuant to California Evidence Code section 1235.  (RT 571-574.)  The

9  superior court determined that this was permissible under state law.  See Bradshaw, supra, 546

10  U.S. at 76.  Under federal law, impeachment of a witness with prior inconsistent statements does

11  not amount to a showing of false testimony under Napue.  See Croft, supra, 124 F.3d at 1119;

12  Zuno-Arce, supra 44 F.3d at 1423.

13          In sum, petitioner has not established that Michaud's trial testimony was false, that

14  the prosecution knew or should have known that any such statements were false, or that any such

15  false statements were material.  As the superior court's conclusion that there was no violation of

16  due process under Napue was objectively reasonable under AEDPA, petitioner is not entitled to

17  relief on this claim.

18  E.  Perjured Declarations

19          Petitioner next claims that the prosecution obstructed justice by submitting

20  perjured declarations in opposition to petitioner's motion for a new trial.  "[S]pecifically,

21  [prosecutor] Alexander knowingly submitted the false declaration of Michael Carrick in order to

22  claim that [petitioner] did not call Carrick at 11:14 a.m. on the morning of the Treasure Lane

23  shooting."  (Ptn. at 112-113.)  Carrick, a friend of petitioner's, signed a declaration stating that he

24  spoke to petitioner by telephone at 11:14 a.m. that day, but post-trial asserted that he did not

25  remember the timing of the call.  "Additionally, Alexander himself submitted a declaration in

26  opposition to O'Brien's allegation of a Brady violation that was knowingly false."  (Id.)  Petitioner

asserts that Carrick's and Alexander's declarations contained "blatant perjury designed to defeat

O'Brien's motion for new trial."  (Id. at 116.)

        In the last reasoned decision on this claim, the El Dorado County Superior Court

wrote:

> Petitioner's fifth ground for relief concerns two declarations filed by Respondent in answer to Petitioner's motion for a new trial. Petitioner claims that Respondent submitted both declarations knowing that they contained false information.
>
> One declaration at issue was authored by the prosecutor, who declared that until the very eve of trial, he was not aware of any Brady information regarding Dr. Curtis Rollins. The other declaration was signed by witness Mike Carrick.
>
> As Petitioner has noted, Respondent filed these two allegedly perjured declarations in response to Petitioner's motion for a new trial. Said motion for a new trial was filed on July 19, 2006. Respondent filed its opposition to this motion, which included the challenged declarations, on August 14, 2006. Petitioner then filed his reply to the Respondent's brief on August 21, 2006. And, the trial court denied the Petitioner's motion for a new trial on August 25, 2006.
>
> Further, Petitioner appealed the trial court's denial of his motion for a new trial. As such, he had the opportunity to litigate any aspect of the new trial motion, including the alleged perjured declarations provided by Respondent, with the Court of Appeals.
>
> The Court of Appeals carefully considered all of the issues Petitioner raised regarding his motion for a new trial. In affirming the trial court's handling of Petitioner's motion for a new trial, the Court reserved twenty-eight pages of its opinion to a discussion of all new trial issues presented.
>
> As discussed above, pursuant to the Waltreus, Dixon, and Seaton cases, a defendant can not bring a habeas petition regarding an issue which was raised on appeal, or which could have or should have been raised on appeal. As such, the Petitioner's fifth ground for relief is denied. [FN 8]
>
> [FN 8: To prove his allegation that the prosecutor submitted a perjured declaration, Petitioner offers only the mutually exclusive declaration of Dr. Rollins. He offers nothing, however, to help ascertain which of these declarations was inaccurate, and whether that inaccuracy constituted perjury.
>
> Further, Petitioner's argument regarding this issue is somewhat

54

curious.  Petitioner condemns the prosecutor for allegedly hiding
Brady material which would have been used to impeach Dr. Rollins.
Yet, to support his charge of prosecutorial misconduct, Petitioner
provides nothing other than the declaration of the same Dr. Rollins.
As such, the Petitioner is making the awkward argument that Dr.
Rollins' trial testimony was not credible, yet offers Dr. Rollins as
his only witness to support the claim that the prosecutor submitted a
perjured declaration.  Condemning Dr. Rollins' credibility on the
one hand, while simultaneously offering him as the sole witness to
support a claim of prosecutorial misconduct on the other hand, falls
well short of a persuasive argument.]

(Sup. Ct. Op. at 8-9.)[11]

Under Napue, "the knowing use of false testimony to obtain a conviction violates

due process regardless of whether the prosecutor solicited the false testimony or merely allowed it

to go uncorrected when it appeared."   Bagley, 473 U.S. at 679, n.8.  If the false evidence is

material — that is, reasonably likely to have affected the judgment of the jury — the defendant's

conviction must be reversed.  Agurs, 427 U.S. at 103.  Although petitioner's claim relates to the

use of perjury in opposing a motion for a new trial, the court concludes that the same principles

should apply, as such a motion has been found to be a "critical stage" of the criminal proceedings

against a defendant.  See Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990).

1. Carrick

At trial, Carrick asserted his Fifth Amendment privilege and did not testify.

However, in support of his July 19, 2006 motion for new trial, petitioner submitted a sworn

declaration by Carrick in a related civil proceeding, Smelser v. O'Brien, Case No. PC 20040078

in the El Dorado County Superior Court.[12]  The declaration was prepared by Joseph Wiseman, the

attorney for petitioner's mother in the civil proceeding.  It stated:

---

[11] Respondent asserts that this claim is procedurally barred.  The Supreme Court has
found that a district court may reach the merits of a habeas petitioner's claim where, as here, the
merits are "easily resolvable against the petitioner whereas the procedural-bar issue involve[s]
complicated issues of state law."  Lambrix v. Singletary, 520 U.S. 518, 525 (1997).

[12] This was a wrongful death action suit filed against petitioner and his mother by the
parents of Kyle Smelser.  (CT 2257.)

1   
2   > On February 26, 2003, at approximately 11:14 a.m., I received on
    > my cellular telephone a call from Sean O'Brien.  This telephone call
    > lasted approximately two minutes and is reflected on page 6 of my
    > AT&T Wireless cellular telephone bill dated November 8, 2003.
3

4   (CT 1767-1768.)  The statement was signed by Carrick and dated October 27, 2005.  (Id.)

5   The subject of the instant claim, Carrick's allegedly perjured declaration, is

6   attached to the prosecution's August 14, 2006 response to petitioner's motion for new trial as

7   Exhibit H.  (CT 2203, 2401.)  In it, Carrick stated:

8   > During the month of September 2005, I received paperwork from
    > Attorney Wiseman, which included a declaration for me to sign.
9   > The declaration stated that Michael Carrick received a phone call
    > from Sean O'Brien on the morning of the murder.  I did not
10  > remember the time of the phone call, so I did not sign the form and I
    > did not mail it back.
11
    > I later received a subpoena for a deposition scheduled for October
12  > 27, 2005. . . .

13  > [At the deposition], I was interviewed by Mr. Wiseman and another
    > man who I believe was an attorney.  My brother Patrick was there as
14  > well.  During the interview they were very interested as to what time
    > I received a phone call from Sean O'Brien on the morning of the
15  > murder.  I repeatedly told them that I did not remember what time it
    > was.  I finally agreed to sign a declaration that would say I received
16  > a phone call from Sean O'Brien on the morning of the murder, but
    > not as to the time of the phone call.
17
    > Mr. Wiseman showed me a declaration to read.  I read it and saw no
18  > time listed as to the phone call.  I told Mr. Wiseman that I would
    > sign that declaration.  Mr. Wiseman then said he needed to change
19  > the date on the declaration, and at that point he left the room.
    > During much of that time that Mr. Wiseman was out of the room,
20  > the other attorney spoke about how I needed to sign the declaration
    > or else I would have to return and answer more questions and that I
21  > might be asked a bunch of questions about my past.

22  > When Mr. Wiseman returned he handed me the declaration to sign.
    > I did not read it this time.  I just signed it.  It was not until days later
23  > that I read the declaration and realized that the time of 11:14 was on
    > it.  That is not correct.  I cannot say what time I received the phone
24  > call.  In fact, if pinned down, I would have to say that the phone call
    > was later that morning because I remember getting out of school
25  > shortly after the phone call.  At that time I was getting out of school
    > at 12:00.
26

1   (CT 2401.)  In an accompanying declaration, Carrick's brother Patrick stated that

2   　　　　during the interview, the attorneys were trying to get Michael to
3   　　　　remember a specific time he may have received a phone call from
    　　　　Sean O'Brien on the morning of the murder.  I recall Michael saying
    　　　　repeatedly that he did not remember the time of the call.  The
4   　　　　attorneys continued trying to get him to commit to a time, but
    　　　　Michael never did.

5
6   　　　　Eventually Michael agreed to sign a declaration that would state that
    　　　　he received a phone call on the morning of the murder, but not as to
    　　　　a specific time.  Michael made it clear that he did not remember the
7   　　　　time of the call.

8   (CT 2402.)

9   　　　　Petitioner asserts that, based on phone records from the day of the murder,

10  Carrick's phone conversation with petitioner had to have taken place at 11:14 a.m. rather than

11  11:47 a.m. (Ptn. at 114.)   The court expresses no opinion on this, but merely points out that, even

12  if true, it would not show that Carrick committed perjury in the above declaration.  Put another

13  way, whether or not Carrick actually spoke to petitioner at 11:14 a.m., he could have been telling

14  the truth when he stated that he did not remember the time of the call when he signed the October

15  2005 declaration.

16  　　　　Petitioner also cites a declaration by Wiseman stating that he "did not trick or

17  deceive Mike Carrick in any fashion."  Rather, the declaration he prepared for Carrick "stated that

18  the incoming call at 11:14 a.m. was from Sean O'Brien, as reflected in Michael Carrick's cellular

19  phone records." (CT 2549.)  Again, this does not contradict Carrick's later, corroborated account

20  that he did not remember the time of the phone call when he signed the declaration.

21  　　　　In any event, petitioner has not shown under Napue that the prosecution knew or

22  should have known that Carrick's declaration contained perjury.  See Croft, supra, 124 F.3d at

23  1119, (fact that witnesses gave inconsistent or conflicting testimony does not establish that such

24  testimony was false).  Finally, petitioner has not shown that the alleged "false evidence" presented

25  by the prosecution – i.e., Carrick's assertion that he did not remember the time of the call and was

26  tricked into signing a time-specific statement – was material to whether petitioner was granted a

1   motion for new trial.  At the hearing on petitioner's motion for new trial, the trial court mentioned

2   evidence concerning "the 11:14 call by Mr. Carrick," but in no way suggested that Carrick's

3   allegedly false declaration was a significant factor in the decision to deny petitioner a new trial.

4   (See RT 1980-1981; CT 2593.)  Thus petitioner is not entitled to habeas relief on this basis.

5   2.  Alexander

6          The second part of petitioner's claim concerns the prosecutor's alleged perjury in a

7   March 21, 2005 declaration, in which he stated that he did not know about Dr. Rollins' "Brady

8   packet" prior to trial.  (CT 2175-2177.)

9          To show a violation of Napue, petitioner must show that this alleged perjury was

10  material to the trial judge's decision to deny petitioner's motion for new trial.  The trial judge's

11  remarks at the hearing on petitioner's motion for new trial make clear that this was not the case.

12  Rather, the trial judge concluded that the Brady packet was largely inadmissible and that there was

13  no due process violation because its materiality was "minimal at best."  (RT 1975-1977.)  As set

14  forth above, the state court of appeal reached the same conclusion in its review of the judgment

15  against petitioner and the denial of his new trial motion.  People v. O'Brien, 2008 WL 2955548,

16  **25-30.  Thus, even if Alexander actually knew about the Brady packet prior to trial, it would

17  not have mattered for purposes of petitioner's new trial motion or subsequent appeal.  Because his

18  perjury claim against Alexander fails the materiality test under Napue, petitioner is not entitled to

19  habeas relief on this basis.

20  F.  Ineffective Assistance

21          Citing thirteen separate grounds, several of which pertain to issues previously

22  addressed herein, petitioner claims he was denied effective assistance of counsel at trial.

23  Petitioner alleges that the following actions or inactions constituted ineffective assistance by

24  defense attorney Clark:

25          a.  Clark failed to ask for a continuance of the trial after the
            prosecutor's untimely February 4, 2004 disclosure of Wellman's
26          January 2, 2004 interview as set forth in Hoagland's four-page

police report;

b.  Clark failed to object to the introduction of Wellman's testimony concerning the timing of the shooting based upon the prosecution's untimely disclosure of Wellman's January 2, 2004 interview;

c.  Clark conducted no additional investigation and presented no additional alibi evidence after learning that Wellman would testify that the shooting took place earlier than Wellman or the prosecution had previously claimed;

d.  Clark failed to adequately cross examine Wellman and Clark failed to introduce evidence to the jury that Wellman only changed his testimony as to the timing of the shooting after Clark had disclosed O'Brien's alibi evidence to the prosecutor on December 22, 2003;

e.  Clark failed to utilize exculpatory evidence that was contained in Hoagland's four-page police report which Clark received on February 4, 2004, including but not limited to Wellman's statement that O'Brien was not on the telephone when he was at O'Brien's house, Wellman's statement that O'Brien did not have or use a cell phone, Wellman's statement that a gun shop employee was putting handguns into a case when Wellman arrived at the gun shop, Wellman's statement that he and Dickson drove down Green Valley Road after leaving the Treasure Lane residence, and Hoagland's statement that the route down Green Valley Road took 47 minutes;

f.  Clark did not introduce evidence from Gilmore, the gun shop employee discussed in Hoagland's four-page report, that Wellman's observation of an employee placing handguns into the display case could have only occurred when the shop first opened at 10 a.m.;

g.  Clark did not adequately cross examine Dr. Rollins about the fact that the door to the Treasure Lane residence had been left open for several hours prior to the discovery of the victim's body, nor did Clark present evidence demonstrating that the victim had been exposed to the colder outside air prior to the examination by Dr. Rollins at the scene;

h.  Clark failed to present corroborating evidence that O'Brien called Mike Carrick from his home telephone at 11:14 a.m. even though Clark discussed this evidence in his opening statement at trial;

i.  Clark failed to adequately cross examine J.D. Petty about his claim that he met O'Brien at the bottom of his driveway shortly after 7:55 a.m. when Petty's school records showed that Petty was in class at that time;

j.  Clark presented some testimony that O'Brien acted normally after

59

he supposedly shot the victim at close range, but Clark failed to present expert mental state opinion that O'Brien could not have acted normally after shooting and killing a human being given his mental characteristics;

k.  Clark failed to adequately cross examine Chantell Michaud about her relationship with Tyler Dickson and the fact that she knew Dickson was involved in the Treasure Lane shooting;

l.  Clark failed to object to the prosecutor's introduction of hearsay statements made by Michaud and detectives Hoagland and Moschini during the direct examination of Michaud;

m.  Clark failed to present evidence which established that the money used by O'Brien and Carrick to buy marijuana on the afternoon of the shooting came from the improper use of ATM cards, not from Jesse Pine's room in the Treasure Lane residence.

(Ptn. at 118-121.)

In the last reasoned decision on this claim, the El Dorado County Superior Court wrote:

Petitioner seeks relief on the grounds that he allegedly received the ineffective assistance of counsel at trial.  He provides thirteen separate examples of his trial counsel's alleged incompetence.

A two-pronged test for determining if counsel rendered ineffective assistance was established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  Under this test, a defendant must establish : 1) that his counsel's performance fell below an objective standard of reasonableness; and 2) that the deficient performance prejudiced his defense.  Id. at 687.

With respect to a showing of incompetence, a showing must be made that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. Strickland at 685.  A court must determine whether, in light of all circumstances, the identified acts or omissions were outside the range of professionally competent assistance.  Id. at 718.

With respect to prejudice, it is not enough for a defendant to show that errors or omissions had some conceivable effect on the outcome of the proceeding.  United States v. Birtle, 792 F.2d 846, 849 (9th Cir. 1986).  "He must show there is some reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland at 694.

Utilizing the <u>Strickland</u> standard, Petitioner's request for relief on
the grounds of ineffective assistance of counsel must be denied.
First, it is clear that many of Petitioner's claims of ineffective
assistance fail because trial counsel's performance did not fall below
an objective standard of reasonableness.  For example, in
Petitioner's very first claim, he alleges that trial counsel rendered
ineffective assistance by failing to seek a continuance after
receiving discovery of Wellman's latest statement.  But, trial
counsel explained his reason for this action in his declaration, which
is attached as an exhibit to Petitioner's brief. [FN 9] In that
declaration, trial counsel indicated that he did not seek a
continuance, in part, because he believed that Wellman's belated
change in his testimony was quite impeachable.  He intended to
argue to the jury that the belated change was due entirely to
Wellman's desire to please the prosecution, and was therefore
untruthful.

[FN 9: See Petitioner's Exhibits, pages 0014-0016, paragraphs 18
and 19.]

Trial counsel's declination to seek a continuance cannot be deemed
to be "outside the range of professionally competent assistance."
<u>Strickland</u> at 718.  While many attorneys would certainly request a
continuance upon receiving this late discovery, some attorneys
would undoubtedly elect to proceed with trial, believing that this
belated discovery, under the circumstances in which it was
obtained, would not be believed by the jury.

More importantly, even if the court were to determine that some or
all of trial counsel's conduct was deficient, Petitioner is not able to
satisfy the second prong of the <u>Strickland</u> test, to wit, the
"prejudice" prong.  To obtain relief, Petitioner has the burden of
establishing that, but for trial counsel's alleged errors, the result of
the trial would have been different.  <u>Strickland</u> at 694.

In discussing Petitioner's appeal, the Court of Appeals observed
that the state of the evidence against the Petitioner was
"overwhelming."  Unpublished appellate opinion at page 34.  This
court agrees with the appellate court's assessment of the evidence
against Petitioner.  And, it concludes that, even if trial counsel had
tried the case in the manner now advocated by Petitioner, there is
not a reasonable probability that the result of the trial would have
been different.

(Sup. Ct. Op. at 9-11.)

The test for demonstrating ineffective assistance of counsel is set forth in

<u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

that, considering all the circumstances, counsel's performance fell below an objective standard of

reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

identify the acts or omissions that are alleged not to have been the result of reasonable

professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

whether in light of all the circumstances, the identified acts or omissions were outside the wide

range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

counsel's conduct was within the wide range of reasonable assistance, and that he exercised

acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

confidence in the outcome."  Id., 104 S. Ct. at 2068.

As to ineffective assistance claims in the federal habeas context, the Supreme

Court has instructed:

> Establishing that a state court's application of Strickland was
> unreasonable under § 2254(d) is all the more difficult.  The
> standards created by Strickland and § 2254(d) are both "highly
> deferential," id., at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S.
> 320, 333, n. 7, 117 S.Ct. 2059 (1997), and when the two apply in
> tandem, review is "doubly" so, Knowles, 556 U.S., at ----, 129 S.Ct.
> at 1420.  The Strickland standard is a general one, so the range of
> reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at
> 1420.  Federal habeas courts must guard against the danger of
> equating unreasonableness under Strickland with unreasonableness
> under § 2254(d).  When § 2254(d) applies, the question is not
> whether counsel's actions were reasonable. The question is whether
> there is any reasonable argument that counsel satisfied Strickland's
> deferential standard.

Harrington v. Richter, 131 S. Ct. 770, 787-788 (U.S. 2011).

/////

1. <u>Ineffectiveness as to Wellman</u>

Petitioner bases several sub-claims on Clark's trial performance with respect to prosecution witness William Wellman.  In an April 8, 2008 declaration, Clark explained his trial decisions concerning Wellman as follows:

> [4]d.  Based upon my review of the prosecution's discovery . . . , I determined that the prosecution would assert that the shooting occurred no earlier than 11:30 a.m. and as late as 1 p.m. on February 26, 2003.  Very early on in the defense investigation, I came to believe that Sean O'Brien had a complete alibi for the time period from 11:30 a.m. through at least 3 p.m. of the day of the shooting.

(Lod. Doc. 11, Exhibits at 5.)

> 16.  [I]t was only *after trial had begun* that I first became aware of the fact that Wellman was changing his story and would testify that all of the relevant events surrounding the shooting took place at least one and one-half hours and possibly two hours earlier than he and Dickson had previously claimed. . . . In other words, I learned that the prosecution had changed it[s] entire theory as to the timing of the shooting after trial had already started and after I had already disclosed O'Brien's alibi defense.  In light of the fact that I had spent the last ten months investigating and developing evidence in support of an alibi defense based upon the prosecution's assertion that the shooting took place after 11:30 a.m., which they had asserted in writing as late as December 16, 2003, as counsel for O'Brien I was now placed in an extremely difficult position.  If Wellman's testimony at trial was consistent with his [recent] statements . . . ,the alibi defense that I had investigated and was prepared to present would be largely incomplete because it did not cover the time period during which Wellman now claimed the shooting occurred.

> 17.  At the time of the prosecution's revelation that it was changing its theory of the timing of the shooting, February 4, 2004, I was burdened with trial preparation . . .

(Lod. Doc. 11, Exhibits at 13-14.)

> 18. . . . I had less than a week to decide how to proceed in light of the prosecution's revelation of February 4.  First, I decided that it would be pointless to seek a continuance of the trial to further investigate O'Brien's alibi for the prosecution's new theory of the timing of the shooting.  Nor did I think an objection to the untimely discovery would be fruitful.  Because trial had already started, neither a continuance nor an objection would have been granted.

> Second, I was aware that we already had some evidence which demonstrated that O'Brien was home before 11:30 a.m. . . . I [also] knew that the jury had to believe the testimony of Wellman in order to convict O'Brien. There was absolutely no physical evidence placing O'Brien at the scene of the shooting. . . . I believed that I could demonstrate to the jury that Wellman changed his story, not because it was the truth, but only to save his plea agreement. If the jury believed Wellman was lying, they would acquit O'Brien.

(Lod. Doc. 11, Exhibits at 14-15.)

Petitioner asserts that Clark was mistaken about the futility of moving for a continuance and that, had the trial court denied a motion to continue under these circumstances, "it would have constituted reversible error." (Ptn. at 122.) Petitioner cites United States v. Garner, 507 F.3d 399, 408 (6th Cir. 2007), in which the Sixth Circuit held that, where the government failed to turn over relevant phone records prior to trial, "the denial of the request for a continuance to enable Garner's counsel to conduct the necessary investigation into the records was an abuse of discretion warranting a new trial." Importantly, however, the Garner court was determining, on direct review, whether the trial court's denial of a continuance under the circumstances of that case constituted a violation of due process. Here, in contrast, the court is determining on AEDPA review "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard" in opting not to seek a continuance in light of the newly disclosed evidence.[13]

Clark's declaration continues as follows:

> My opening statement at trial reflected the decisions I made after February 4th. I began my discussion of the evidence by addressing Wellman's statement to the police on March 7, 2003. I pointed out that in this statement Wellman claimed that he did not arrive at

---

[13] Nor is it clear that the trial court would have excluded Wellman's testimony if Clark had objected to the prosecution's eleventh-hour disclosure that Wellman's story had changed. Under the California statute governing enforcement of the discovery rules in criminal cases, "the court may prohibit the testimony of a witness . . . only if all other sanctions have been exhausted." Cal. Penal Code § 1054.4(c). See also People v. Merritt, 19 Cal. App. 4th 1573, 1579 (1993) ("With respect to untimely disclosure of evidence, it is the defendant's burden to show that a continuance cannot cure the harm of late disclosure.")

1    O'Brien's house until 11 a.m. and that he claimed he did not arrive
     back at O'Brien's house after the shooting until 1:30 p.m.  I next
2    described for the jury the telephone calls O'Brien made and
     received from home during the time Wellman claimed they were at
3    Treasure Lane committing the offenses. . . . I then addressed
     Wellman's new story.  I told the jury 'about two weeks ago'
4    Wellman decided he 'arrived at O'Brien's house about 9:30, 9:45'
     and went to the Big Horn Gun Shop about 15 minutes later.
5    However, I told the jury, even that couldn't be true because O'Brien
     spoke [on the phone] at 10:12 a.m. . . . and 10:30 a.m.  I ended my
6    opening statement by telling the jury that 'regardless of which
     version of Mr. Wellman's time frames you care to believe, Mr. Sean
7    O'Brien was home on the day of the crime.'  Thereafter, during the
     trial, I proceeded to prove the two themes I set forth in my opening
8    statement: that O'Brien had an alibi for the time of the shooting and
     that Wellman was not credible.

9

10   (Lod. Doc. 11., Exhibits at 15-16.)

11          Clark's trial strategy failed, and petitioner was convicted.  At the time, however, it

12   was not unreasonable for Clark to attempt to discredit Wellman and present evidence that

13   petitioner had an alibi for the morning of the shooting.  To this end, Clark aggressively cross-

14   examined Wellman about his plea agreement, his past dishonesty, and the fact that he had given

15   one account of the timing when his memory was fresh, but changed his story after ten months in

16   jail.  (RT at 448-468.)  Clark argued to the jury that Wellman testified falsely at trial in the hopes

17   of obtaining a more lenient sentence.  (RT 1693-1701.)  He offered evidence of telephone calls

18   made and received by petitioner on the morning of the shooting to show that petitioner did not

19   have time to commit the murder.  (RT at 1722-1723, 1726.)  Finally, Clark argued, based on the

20   testimony of Dr. Rollins, that the time of death was close to 12:30 p.m. when petitioner had an

21   undisputed alibi, rather than earlier in the morning.  (RT 1729-1731.)  Based on this record, the

22   state court's denial of petitioner's ineffectiveness claims as to Wellman was objectively

23   reasonable on AEDPA review.

24   2.  Failure to Introduce Evidence

25          Petitioner raises several sub-claims of ineffective assistance based on Clark's

26   failure to introduce various evidence, including evidence that petitioner called Michael Carrick on

11:14 a..m. on the day of the shooting.  Clark stated in his declaration that he intended to present

this evidence through Carrick's testimony but could not because Carrick asserted his Fifth

Amendment right not to testify.  (Lod. Doc. 11., Exhibits at 18.)

In fact, Carrick was interviewed three times by police in connection with Smelser's

murder and made numerous statements that would have been highly unfavorable to petitioner had

the jury learned of them.  (See, e.g., CT at 2309, in which Carrick tells police that petitioner

"showed me the money and is like I went up to the house and I robbed it and I got this money . . .

and he had a little chuckle about it.")  According to the prosecutor, "[t]rial counsel made the right

decision to leave well enough alone and not attempt to corroborate defendant O'Brien's testimony

that he spoke with Carrick at 11:15 a.m. . . . [H]ad trial counsel 'pushed' this issue, the balance

may have tipped in favor of granting Carrick immunity and compelling his testimony.  This would

have allowed for the admission of Carrick's statements to detectives . . . , either directly or as

prior inconsistent statements if he recanted."  (CT at 2256-2257.)  The undersigned finds this

argument persuasive and concludes that state court was objectively reasonable in finding that

Clark was not ineffective in his evidentiary decisions regarding Carrick.

As to petitioner's other arguments regarding Clark's failure to introduce evidence

(sub-claims e, f, j, and m), petitioner has not carried his burden to show prejudice resulting from

these alleged errors.  There was ample evidence before the jury that petitioner was guilty of killing

Smelser, including Wellman's testimony describing how the crimes occurred and petitioner's role

in them (RT 370-385, 388-405, 407-410); Petty's testimony about loaning petitioner a shotgun on

the morning of the shooting (RT 670-671); Dickson's corroborating testimony (RT at 1517-1530);

and petitioner's own incriminating admissions to others after the shooting.  (See, e.g., RT at 726

(when asked how he had come into a large amount of money after the shooting, petitioner

reportedly joked that the had "killed somebody for it.").  In light of the trial record as a whole,

petitioner has not shown the state court unreasonably applied Strickland to the above claims.

/////

3.  Failure to Cross-Examine

Petitioner also raises sub-claims of ineffective assistance based on Clark's alleged failure to adequately cross-examine Dr. Rollins, J. D. Petty, and Chantell Michaud (sub-claims g, i, and k).  He also claims that Clark was ineffective in failing to object to the prosecutor's introduction of hearsay during direct examination of Chantell Michaud (sub-claim l).  Here too, petitioner has not shown prejudice from any of these alleged errors so as to be entitled to relief under the Strickland and Richter standards.  Accordingly, petitioner's ineffective assistance claim should be denied in its entirety.

G.  Instructional Error

Petitioner next claims that the trial court's jury instructions on the elements of felony murder were flawed because the trial court failed to instruct the jury on all the elements of robbery.  Petitioner asserts that, in determining whether petitioner was guilty of felony murder, "the jury was expressly told that it could base a guilty verdict on either robbery or burglary. . . . Thus, the jury could have found that the killing occurred during the course of a robbery, and that felony-murder was thus established, without ever considering whether it had also occurred during a burglary."  (Ptn. at 142.)  However, the jury explicitly found that petitioner committed the murder while "engaged in the commission of a robbery, within the meaning of Penal Code Section 190.2(a)(17)(A)" and, in a separate finding, that petitioner committed the murder while "engaged in the commission of a residential burglary, within the meaning of Penal Code Section 190.2(a)(17)G)."  (RT 946-947.)

In the last reasoned decision on this claim, the state court of appeal wrote:

The Attorney General acknowledges the trial court did not instruct on the elements of robbery. Specifically, the court did not inform the jury that robbery constitutes the taking of property from a person against his will, by force or fear, and with the intent to permanently deprive that person of the property. (CALJIC No. 940.) The Attorney General admits that this failure to instruct constituted error with respect to the robbery special circumstance.

As a result of this error, O'Brien claims the jury's general verdict of

felony murder must be set aside because, he argues, we cannot determine whether the jury reached its verdict by relying exclusively on an insufficient ground, the robbery charge. Relying on Lara v. Ryan (9th Cir. 2006) 455 F.3d 1080, 1085 (Lara ), O'Brien asserts that this error is structural and not amenable to harmless error review. Accepting the test announced in Lara for purposes of argument only, we conclude the error was harmless under an exception in the Lara test because in this instance we in fact can determine with certainty that the jury reached its verdict on at least one valid ground.

California courts and the federal Ninth Circuit Court of Appeals disagree over a reviewing court's scope of review when a jury was instructed with alternate legal theories for reaching a general verdict, one of which is invalid or erroneously described. Traditionally, California has reviewed such error under the harmless error standard of Chapman v. California (1967) 386 U.S. 18, 21. (People v. Lee (1987) 43 Cal.3d 666, 673-676.) In Lara, however, the Ninth Circuit proclaimed that such error was structural and reversible per se. (Lara, supra, 455 F.3d at p. 1086.)

We need not weigh in on this disagreement because both court systems agree that the rendition of such alternative instructions is harmless where the reviewing court can determine with certainty that the jury relied upon the legally correct theory in reaching its verdict. (People v. Guiton (1993) 4 Cal.4th 1116, 1130; People v. Kelly (1992) 1 Cal.4th 495, 531; Lara, supra, 455 F.3d at p. 1085.)

Indeed, the Lara court, in finding this exception governed the case before it, stated it thusly:

"'[R]eversal is not required if "it is absolutely certain" that the jury relied upon the legally correct theory to convict the defendant.' [Citations (emphasis in original) ]. [Citation.] ('The cases in which [the requirement to reverse] has been applied all involved general verdicts based on a record that left the reviewing court uncertain as to the actual ground on which the jury's decision rested.' [Italics in original.] We [the Ninth Circuit] have applied this 'absolute certainty' principle in several habeas cases. [Citations.]" ( Lara, supra, 455 F.3d at p. 1085.)

California courts describe the test similarly. The error is harmless when "it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." (People v. Guiton, supra, 4 Cal.4th at p. 1130.) "An instructional error presenting the jury with a legally invalid theory of guilt does not require reversal ... if other parts of the verdict demonstrate that the jury necessarily found the defendant guilty on a proper theory." (People v. Pulido (1997) 15 Cal.4th 713, 727.) FN24

FN24. On petition for writ of habeas corpus, the Ninth Circuit in

68

Pulido v. Chrones (9th Cir. 2007) 487 F.3d 669, 675-676, concluded the California Supreme Court in People v. Pulido, supra, 15 Cal.4th 713, erred in applying harmless error analysis to affirm the defendant's conviction where the jury had been instructed on alternate theories. The federal court stated the error occurred because the instructions on all of the alternate theories were in error. Thus, the court could not determine with absolute certainty that the jury had convicted the defendant on a proper theory. The court's decision, however, did not alter the state Supreme Court's formulation of the exception for affirming the verdict where a court can determine with certainty that the jury relied upon a proper theory. The United States Supreme Court has granted certiorari of the Ninth Circuit's decision. (Chrones v. Pulido (2008) --- U.S. ----, 128 S.Ct. 1444.)

Here, we can determine the jury necessarily convicted O'Brien on a legally correct theory - felony murder in the commission of a burglary. The trial court fully instructed the jury on the elements of burglary, including the requirement of specific intent. O'Brien does not dispute this. The jury determined O'Brien was guilty of this crime, and pursuant to the instruction on felony murder, it determined he was guilty of murder.  Because we can determine that the verdict rested on at least one correct theory, the trial court's failure to instruct on the elements of robbery is of no consequence to the murder charge.  (People v. Kelly, supra, 1 Cal.4th at p. 531, 3 Cal.Rptr.2d 677, 822 P.2d 385.)

O'Brien disagrees with our conclusion. He asserts that because the felony-murder instruction described murder as the unlawful killing of a human being during the course of a "robbery or burglary," and because the jury did not indicate which ground it relied upon, there is a possibility the jury reached its verdict based on the uninstructed robbery theory. That possibility, however, is not dispositive in this case.

The felony-murder instruction did not require the jury to convict O'Brien only on one of the two possible theories. The jury could convict him on either theory or both theories. Here, there is no doubt that the jury convicted him on both theories, as it found true the special circumstance allegations for robbery and burglary. There is also no doubt that the burglary conviction rested on correct and complete instructions. Thus, we can determine with absolute certainty that the jury relied upon a legally correct theory to convict O'Brien of murder. That the other possible theory the jury relied upon was not legally correct is of no moment.

People v. O'Brien, 2008 WL 2955548, **34-36.

Instructional errors are generally subject to harmless error review.  Babb v. Lozowsky, — F.3d ----, 2013 WL 2436532, *12 (9th Cir. June 6, 2013), citing Neder v. United

1  States, 527 U.S. 1, 7 (1999); California v. Roy, 519 U.S. 2, 5 (1996).  The Supreme Court has

2  held that where a jury is instructed on multiple theories of guilt and one theory is legally incorrect,

3  that erroneous jury instructions must be analyzed under the harmless error standard to determine

4  whether "the flaw in the instructions 'had substantial and injurious effect or influence in

5  determining the jury's verdict.'"  Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (quoting Brecht v.

6  Abrahamson, 507 U.S. 619, 623 (1993)).  "[W]hen considering whether erroneous instructions

7  constitute harmless error, courts ask whether it is reasonably probable that the jury would still

8  have convicted the petitioner on the proper instructions."  Babb, 2013 WL 2436532, *13, citing

9  Belmontes v. Brown, 414 F.3d 1094, 1139 (9th Cir. 2005).

10         Here, the jury found petitioner guilty of committing murder while engaged in a

11  residential burglary.  Because this finding was independent of whether petitioner was also guilty

12  of robbery, it is more than "reasonably probable" that the jury would have convicted petitioner if

13  correctly instructed on the elements of robbery.  As the state court's conclusion to this effect was

14  reasonable under AEDPA, petitioner is not entitled to relief on this claim.

15  H.  Cumulative Error

16         Petitioner next claims that cumulative errors at trial require the reversal of this

17  conviction.  (Ptn. at 144-146.)  In the last reasoned decision on this claim, the El Dorado County

18  Superior Court wrote:

19         Petitioner claims that even if the errors of the trial court, prosecutor,
       and defense do not individually constitute grounds for relief, the
20         cumulative effect of these errors requires that he be granted relief.
       For the reasons discussed above . . . , the court concludes that
21         Petitioner's request for relief on this ground should be denied.

22  (Sup. Ct. Op. at 11.)

23         The Ninth Circuit has concluded that under clearly established United States

24  Supreme Court precedent, the combined effect of multiple trial errors may give rise to a due

25  process violation if it renders a trial fundamentally unfair, even where each error considered

26  individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007)

1  (citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) and <u>Chambers v. Mississippi</u>, 410

2  U.S. 284, 290 (1973)).  <u>See also</u> <u>Hayes v. Ayers</u>, 632 F.3d 500, 524 (9th Cir. 2011) (if  no error of

3  constitutional magnitude occurred at trial, "no cumulative prejudice is possible").  "The

4  fundamental question in determining whether the combined effect of trial errors violated a

5  defendant's due process rights is whether the errors rendered the criminal defense 'far less

6  persuasive than it might [otherwise] have been,' <u>Chambers</u>, 410 U.S. at 294, and thereby had a

7  'substantial and injurious effect or influence' on the jury's verdict." <u>Parle</u>, 505 F.3d at 927

8  (quoting <u>Brecht</u>, 507 U.S. at 637).

9          The undersigned has addressed each of petitioner's claims raised in the instant

10  petition and has concluded that no error of constitutional magnitude occurred at his trial.  This

11  court also concludes that the errors alleged by petitioner, even when considered together, did not

12  render his defense "far less persuasive," nor did they have a "substantial and injurious effect or

13  influence on the jury's verdict."   Accordingly, petitioner is not entitled to relief on his claim of

14  cumulative error.

15  I.  <u>Actual Innocence</u>

16          Finally, petitioner claims that he is entitled to federal habeas relief on the ground

17  that he is factually innocent.  (Ptn. at 147-148.)  In the last reasoned decision on this claim, the El

18  Dorado County Superior Court concluded:

19          Petitioner's eighth and final ground for relief is that he is factually
           innocent.  He makes this allegation despite direct contrary findings
20          by the jury, trial court, and appellate court.

21          Based on this court's examination of the record, and its discussion
           in Sections I throughVII above, the court denies Petitioner's request
22          for relief.

23  (Sup. Ct. Op. at 12.)

24          In <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998), the Supreme Court

25  explained that, "[t]o establish actual innocence, petitioner must demonstrate that, in light of all the

26  evidence, it is more likely than not that no reasonable juror would have convicted him."  (Internal

71

1    quotation marks omitted.)  Petitioner bears the burden of proof on this issue by a preponderance

2    of the evidence, and he must show not just that the evidence against him was weak, but that it was

3    so weak that "no reasonable juror" would have convicted him.  Lorentsen v. Hood, 223 F.3d 950,

4    954 (9th Cir. 2000).  In making or rebutting this showing, the parties are not limited to the

5    existing trial record; the issue is "factual innocence, not mere legal insufficiency." Id., citing

6    Bousley, 523 U.S. at 623.

7              Here, while petitioner has pointed to various evidence that arguably would have

8    bolstered his defense, he has not proved by a preponderance of the evidence that, taking the record

9    as a whole, no reasonable juror would have convicted him of the murder of Kyle Smelser.  Thus

10   petitioner is not entitled to federal habeas relief on this basis.

11   J.  Evidentiary Hearing

12             Petitioner seeks an evidentiary hearing "as to every claim but Claim Seven

13   [instructional error]."  (Ptn. at 148.)  In Cullen v. Pinholster, __U.S.__, 131 S. Ct. 1388 (2011),

14   the Supreme Court held that, when a state court decides a habeas claim on the merits, the federal

15   court's inquiry under 28 U.S.C. § 2254(d)(1) is limited to the record before the state court.  Courts

16   since Pinholster agree that the limitation of review to the state court record also applies to review

17   under § 2254(d)(2).  E.g., Coddington v. Cullen, No. CIV S 01-1290 KJM GGH, 2011 WL

18   2118855 (E.D. Cal. May 27, 2011).  Here, as to those claims decided on the merits in the state

19   courts, the record on federal habeas review is limited to the record before the state court.  Nor is

20   petitioner entitled to an evidentiary hearing on claims determined to be procedurally barred from

21   federal habeas review.  Accordingly the court will deny petitioner's request.

22             Accordingly, IT IS HEREBY RECOMMENDED THAT:

23             1.  The petition (ECF No. 1) be denied; and

24             2.  This case be closed.

25             These findings and recommendations are submitted to the United States District

26   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

 Dated: August 16, 2013

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 / obri2472.hc

73