1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SEAN ALAN O'BRIEN,                          No.  2:10-cv-02472 MCE CKD (HC)

12              Petitioner,

13        v.                                     FINDINGS AND RECOMMENDATIONS

14   LELAND McEWEN, Warden,

15              Respondent.

16

17   I.  Introduction

18        Petitioner commenced this federal habeas action in 2010, challenging his 2006 conviction

19   for first degree murder with special circumstances, resulting in a sentence of life without parole,

20   plus ten years.  The conviction was based on the murder of Kyle Smelser in 2003, when petitioner

21   was sixteen years old.  On April 16, 2014, the district judge adopted August 19, 2013 findings

22   and recommendations and denied the petition.  A certificate of appealability was issued as to

23   whether petitioner's trial attorney, James Clark, rendered ineffective assistance of counsel.

24        On August 23, 2015, the Ninth Circuit Court of Appeals affirmed in part and reversed in

25   part, remanding for an evidentiary hearing with respect to several sub-claims of ineffective

26   assistance.  This hearing was held before the undersigned on January 17 and 18, 2017.  Petitioner

27   was represented by David Nickerson and Scott Tedmon, and defendant was represented by Max

28   Feinstat and Tami Krenzin.  After the hearing, the parties submitted post-hearing briefs, with the

1

1  matter submitted in September 2017.  (ECF Nos. 83, 90 & 93.)

2  II.  <u>The Ninth Circuit's Remand</u>

3       In Claim 6, the petition asserted thirteen sub-claims of ineffective assistance of counsel.

4  (Ptn. at 118-121.)  The district court found the state courts' denial of these claims objectively

5  reasonable under AEDPA.  (<u>See</u> ECF No. 27 ("F&Rs") at 58-67, ECF No. 31.)

6       The Ninth Circuit reversed the denial of petitioner's IAC claim "to the extent the claim is

7  predicated on alleged deficiencies in trial counsel's presentation of O'Brien's defense[.]"  (ECF

8  No. 43 at 8.)   It ordered an evidentiary hearing with respect to the allegations referenced in Claim

9  6, summary paragraphs (c), (d), (e), (f), (h), (i), (k), and (m) of O'Brien's federal habeas petition.

10  (<u>Id.</u> at 8-9.)

11       In its order of remand, the Ninth Circuit wrote:

12           The state court's application of <u>Strickland</u>[1] to [the above sub-
             claims] was objectively unreasonable.  Because the state court
13           denied O'Brien's request for an evidentiary hearing and did not
             issue an order to show cause, the state court's task under <u>Strickland</u>
14           was to decide whether the allegations in O'Brien's habeas petition,
             if true, established a prima facie case of ineffective assistance.  <u>See</u>
15           <u>Cannedy v. Adams</u>, 706 F.3d 1148, 1160 (9th Cir. 2013).

16           The state court rejected [these claims] on the ground that, even if
             counsel's  performance  in  presenting  O'Brien's  defense  was
17           deficient, O'Brien failed to establish prejudice under <u>Strickland</u>. . . .
             [Thus] O'Brien needed to show that, but for counsel's allegedly
18           deficient performance, there is a reasonable probability that at least
             one juror would have credited the additional evidence and harbored
19           a reasonable doubt about his guilt.  <u>See Cannedy</u>, 706 F.3d at 1166.
             To make that determination, the court had to 'compare the evidence
20           that actually was presented to the jury with that which could have
             been presented had counsel acted appropriately."  <u>Id.</u> at 1163.
21

22           . . .

23           Because the allegations on O'Brien's federal habeas petition
             establish a colorable claim for relief, and because the allegations are
24           not inherently incredible or refuted by the existing state court
             record, the district court could not reject his [IAC] claim without
25           holding an evidentiary hearing.  <u>See</u> <u>Earp v. Ornoski</u>, 431 F.3d
             1158, 1167 (9th Cir. 2005)[2]; cf. <u>Hibbler v. Benedetti</u>, 693 F.3d

26  _____

    [1] <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).
27

28  [2] "[W]here the petitioner establishes a colorable claim for relief and has never been afforded a
    state or federal hearing on this claim, we must remand to the district court for an evidentiary

                                          2

1                         1140, 1149 (9th Cir. 2012).

2 (ECF No. 43 at 5-6, 8.)

3      In Hibbler, the Ninth Circuit explained that "[i]n some limited circumstances, we have

4 held that the state court's failure to hold an evidentiary hearing may render its fact-finding

5 process unreasonable under § 2254(d)(2)." [3] 693 F.3d at 1147. However, "an evidentiary hearing

6 is not required on issues that can be resolved by reference to the state court record." Id. (citations

7 omitted). In Cannedy, the Ninth Circuit explained what type of evidence could show prejudice

8 under Strickland:

9             To determine whether counsel's errors prejudiced the outcome of
the trial, we must compare the evidence that actually was presented

10             to the jury with that which could have been presented had counsel
acted appropriately. . . . Thus, we must first consider whether [the

11             evidence] could have been admitted at trial. If the evidence could
have been admitted, we must then ask whether there was a

12             reasonable probability that it would have affected the outcome of
the proceeding.

13

14 706 F.3d at 1163 (citations omitted).

15      In a July 14, 2016 order, the undersigned set forth the Cannedy standard, concluding:

16 "Thus, the evidentiary hearing in this matter is concerned with attorney deficiency and prejudice

17 issues that cannot be resolved by reference to the state court record. Its scope includes state-

18 admissible evidence 'which would have been presented had counsel acted appropriately,' as well

19 as any evidence of prejudice under Strickland." (ECF No. 58 at 2-3.)

20      At the hearing, petitioner had the burden of proving for each sub-claim that (1) Clark's

21 performance was deficient, and (2) there is a reasonable probability that, but for Clark's

22

23 hearing. [Citations.] In other words, a hearing is required if: (1) the defendant has alleged facts
that, if true, would entitle him to habeas relief, and (2) he did not receive a full and fair

24 opportunity to develop those facts." Earp, 431 F.3d at 1167. See also Habeas Rule 8
(Evidentiary Hearing), Advisory Notes (explaining when federal evidentiary hearing is required).

25 [3] "Challenges under § 2254(d)(2) fall into two main categories. First, a petitioner may challenge

26 the substance of the state court's findings and attempt to show that those findings were not
supported by substantial evidence in the state court record. Second, a petitioner may challenge

27 the fact-finding process itself on the ground that it was deficient in some material way." Id. at
1146 (citations omitted).

28

unprofessional errors, the result would have been more favorable to petitioner as a criminal

defendant.  <u>Strickland</u>, 466 U.S. at 688.

III.  <u>Factual Background</u>

To provide factual context for the claims, the undersigned summarizes the trial evidence

against petitioner as set forth in the state court of appeal's decision, <u>People v. O'Brien</u>, 2008 WL

2955548 (Cal. App. 3d Dist. Aug. 4, 2008).  (<u>See</u> ECF No. 16-1.)

William Wellman testified for the prosecution against defendants petitioner and Tyler

Dickson pursuant to a plea bargain.  In February 2003, Wellman was twenty years old; Dickson

was seventeen; and petitioner was sixteen.  On the morning of February 26, 2003, Wellman and

Dickson drove to petitioner's house and discussed a plan to steal money, marijuana, and dirt bikes

from a home they believed would be empty.  They then drove to the Big Horn Gun Shop.

Petitioner had a shotgun with him, and Wellman, at petitioner's request, bought a box of shotgun

shells, as he was over eighteen years old.  (<u>Id.</u> at 2-4.)

The trio then drove to Treasure Lane and entered the house, petitioner carrying the

shotgun.  Unexpectedly, Smelser emerged from a bedroom carrying a rifle and asked: "What are

you doing in my house?"  Wellman and Dickson ran back to the truck and heard a gunshot from

inside the house.  Petitioner came out of the house and said Smelser was dead.  The three went

back inside the house, where petitioner took a large amount of cash and Wellman took marijuana.

They also took Smelser's rifle and threw it into a pond on the way to back to petitioner's house.

(<u>Id.</u> at 4-7.)

Testifying on his own behalf, Dickson corroborated Wellman's testimony as to

petitioner's actions on the day of the murder.  He could not recall what time they arrived at

petitioner's house that morning.  (<u>Id.</u> at 23-26, 35.)

Petitioner's friend J.D. Petty testified that shortly before 8 a.m. on the morning of the

murder, he loaned petitioner his shotgun, which was caked with mud from duck hunting.  Around

11:30 a.m., petitioner called Petty and gave the shotgun back to him.  It appeared to have been

wiped down.  Petitioner also gave Petty a box of shotgun shells from the Big Horn Gun Shop.

One of the shells was missing, and petitioner told Petty he shot it into a hillside.  (<u>Id.</u> at 11-12.)

Petitioner's friend Chantell Michaud testified that she called petitioner at home at 10:30 on the morning of the murder, when he said he was going to get some marijuana, money, and dirt bikes that day. He said the place where he would get these things had roommates, but he did not think they would be home. He told Michaud he was leaving after their phone call. That evening, Michaud asked petitioner if everything had gone okay. Petitioner said, "No, it didn't go okay," and told her he didn't want to talk about it over the phone. Later that evening, Michaud saw a report of Smelser's murder on the television news. The next day, she asked petitioner if that was what went wrong the day before. In a pretrial interview, Michaud told police that he had answered her question affirmatively. (Id. at 13-14.)

Petitioner's friend Richard Anschutz testified that he spoke to petitioner by phone at 11:34 a.m. on the day of the murder. Petitioner said he had $2,500 and wanted to buy marijuana. When Anschutz asked petitioner where he got the money, petitioner replied that he didn't want to discuss it over the phone. (Id. at 14.) Petitioner's friend Richard Lacerte testified that he spoke to petitioner on the day of the murder, and during one such conversation, petitioner told Lacerte that he had "a couple grand" and was going to buy marijuana. (Id. ) Another friend, Frankie Silici, testified that, prior to the murder, he had taken petitioner to the Treasure Lane house on two occasions to buy marijuana. (Id. at 12.)

The time of the shooting was a key issue at trial. Before trial, petitioner's attorney James Clark believed that the prosecution would argue that the shooting took place between 11:30 a.m. and 1:00 p.m. Clark spent months developing evidence showing that petitioner had an alibi for this period. (F&Rs at 63, citing Lod. Doc. 11, Exhibits at 13-14.) At trial, Clark learned that Wellman had changed his story and would testify that the shooting took place before 11:30 a.m. In an April 2008 declaration, Clark explained that he decided not to seek a continuance of the trial to further investigate petitioner's alibi for the morning of the shooting. First, he did not think a continuance would be granted. Second, he already had some evidence that petitioner was home before 11:30 a.m. Clark believed he could "demonstrate to the jury that Wellman changed his story, not because it was the truth, but only to save his plea agreement. If the jury believed Wellman was lying, they would acquit O'Brien." (Id. at 64, citing Lod. Doc. 11, Exhibits at 14-

15.)

IV.  Ineffective Assistance Sub-Claims

Per the Ninth Circuit's order of remand, an evidentiary hearing was held on Claim 6, subclaims (c), (d), (e), (f), (h), (i), (k), and (m) of O'Brien's federal habeas petition, alleging ineffective assistance of trial counsel.

Petitioner presented five witnesses: defense attorney James Clark; gun shop employee Bob Gilmore; Edward Winslow, who worked with petitioner's mother at her auto shop; William Wellman, who pled to second degree murder and testified against petitioner; and petitioner's friends Chantelle Michaud and J.D. Petty.  Following the hearing, the parties submitted post-hearing briefs.  (ECF Nos. 83, 90 & 93.)  The matter was submitted on September 20, 2017.

In post-hearing briefing, respondent asserted, and petitioner did not dispute, that after the hearing petitioner abandoned the two subclaims concerning Michaud and Petty.[4]  Also in post-hearing briefing, petitioner raises arguments that are outside the scope of the remand and/or procedurally barred.[5]  The remanded and disputed subclaims are discussed below.[6]

The Supreme Court has enunciated the standards for judging ineffective assistance of counsel claims.  See Strickland v. Washington, 466 U.S. 668 (1984).  First, a defendant must show that, considering all the circumstances, counsel's performance fell below an objective

---

[4] Claim 6(i) alleged that "Clark failed to adequately cross examine J.D. Petty about his claim that he met O'Brien at the bottom of his driveway shortly after 7:55 a.m. when Petty's school records showed that Petty was in class at that time." (Ptn. at 120.)  Claim 6(k) alleged that "Clark failed to adequately cross examine Chantelle Michaud about her relationship with Tyler Dickson and the fact that she knew Dickson was involved in the Treasure Lane shooting." (Id.)

[5] In post-hearing briefing, petitioner claims Clark was ineffective for failing to specifically ask Carrick whether he would invoke his Fifth Amendment right to remain silent about an alleged 11:14 a.m. call to petitioner.  Petitioner also claims Clark was ineffective for failing to question Detective Hoagland about Carrick's pretrial statements, which petitioner argues were admissible under the new theory that Carrick was an unavailable witness under California Evidence Code section 1350. While the undersigned addresses these arguments herein, they were never presented to a state court.

[6] The court adopts the parties' designations of the record: "EHRT" refers to the reporter's transcript of the evidentiary hearing. "E" refers to petitioner's exhibits attached to his post-hearing memorandum.  "RT" and  "CT" refer to trial records, as in the F&Rs.

standard of reasonableness. Strickland, 466 U.S. at 688. To this end, the defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690. The court must then determine, whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id. Second, a defendant must affirmatively prove prejudice. Id. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. See also United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir. 1984) (per curiam).

As to ineffective assistance claims in the federal habeas context, the Supreme Court has instructed: "The standards created by Strickland and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so[.] . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105 (internal citations omitted).

### 1. Bob Gilmore

The first witness to testify was gun shop employee Bob Gilmore. His testimony went to Claim 6(f), in which petitioner alleged ineffectiveness because:

> (f) Clark did not introduce evidence from Gilmore, the gun shop employee discussed in Hoagland's four-page report, that Wellman's observation of an employee placing handguns into the display case could only have occurred when the shop first opened at 10 a.m.

(Ptn. at 119.) The "Hoagland Report" documented a January 2, 2004 interview between Wellman, Wellman's attorney, Detective Hoagland, and District Attorney Joe Alexander. The report was provided to petitioner's defense attorney the day after trial started. (See F&Rs at 22, citing Lod. Doc. 11, Exhibits at 184-187.[7]) In relevant part, the report states:

---

[7] Also located at E193-196 (petitioner's exhibit of Hoagland Report).

> Wellman was then asked if he recalled anything significant while inside the Big Horn Gunshop at that time of the morning [of the shooting]. Wellman said he recalled an employee behind the counter placing guns in the display case and a middle-aged customer talking to another employee about an upcoming hunting trip.

(Lod. Doc. 11, Exhibits at 185.)

At trial, gun shop employee Carl Christofferson testified that, in 2003, he opened the store on weekday mornings at 10:00 a.m. He recalled selling a box of shotgun shells in February 2003 to a tall young man who was accompanied by two younger and shorter men. The transaction took place right after the store opened at 10:00 a.m., and then men were the "first ones in the door." (ECF No. 16-1 at 18; 5 RT at 1099.) In his closing statement, prosecutor Alexander argued that Christofferon's testimony corroborated Wellman's testimony that Wellman, Dickson, and petitioner bought the shells used in the shooting at the Big Horn Gun Shop on the day of the murder. Alexander also argued that Christofferson's recollection of the timing was vague, "in the range" of 10:15 to 10:45. (7 RT 1662-1663.) Petitioner asserts that Clark should have called Gilmore to testify, placing Wellman at the gun shop at 10 a.m., when petitioner had an alibi.[8]

At the evidentiary hearing, Gilmore testified that, in February 2003, he had worked at the Big Horn Gun Shop for about five years. He described the daily process of opening the store: Staff would arrive and unlock the building between 9:30 and 9:45 a.m. "We kept the handguns locked up, so next procedure was to unlock them from their storage, put them out in the display case." This process took five minutes and occurred before the public was allowed inside. After placing money trays in the cash register, staff would open the front doors to the public at 10 a.m. At night, staff took the handguns out of the display cases in trays and locked them in a secure container. (EHRT 22-24.)

> Q: So outside the procedure of putting the guns in the display case in the morning, were guns ever taken in and out of the display case at any other time during the day?

---

[8] As the Ninth Circuit summarized, "The State's theory was that the murder occurred between 10:30 a.m. and 11:30 a.m. O'Brien had a solid alibi, which the State did not contest, establishing that he was at home throughout the period both before and after that one-hour window." (ECF No. 43 at 7.)

A:  Absolutely.  Just about every time we had a customer.

Q:  So when you had customers, they would ask for a gun, gun would be taken out, you'd show it to them.

A: Yes, sir.

Q:  And then it would be put back?

A:  Yes, sir.  . . . If they wanted to see one, they saw it.  If they want to see another, put it back and get another out.

Q:  There could be guns moving in and out of the display case at any time during the day?

A:  Yes, sir.

(EHRT 26-27.)  Gilmore further testified that, before the store opened, the guns were moved into the case in trays, but would be taken out for customers "generally one at a time."  (EHRT 28.) Gilmore confirmed that Clark never asked him to testify at trial.  (EHRT 28.)  At the evidentiary hearing, Wellman could not remember anything about guns being placed into the case at the gun shop.  (EHRT 197-198.)  Clark testified that, because he called Christofferson, who was working on the day of the shooting, as a witness, there was no need to also call Gilmore, who was not at the shop that day.  (EHRT 146.)

In post-hearing briefing, petitioner argues that Gilmore's testimony would have established that "Wellman entered the gun shop at precisely 10, when the handguns were being placed into the display case," thus establishing that Wellman "lied about O'Brien being at the gun shop."  (ECF No. 83 at 15-16.)  However, Gilmore's testimony is consistent with Wellman seeing "an employee behind the counter placing guns in the display case and a middle-aged customer talking to another employee about an upcoming hunting trip" at some point later than 10 a.m. According to Gilmore, the guns already would have been in the display case when the shop opened to the public, but a gun could have been removed from, and returned to, the case at any time if requested by a customer.

Because Gilmore's testimony does not establish what time Wellman arrived at the gun shop, Clark's failure to call him as a witness does not constitute ineffective assistance, nor has petitioner shown prejudice.

2. Ned Winslow

Petitioner argues that Clark should have called Edward "Ned" Winslow as a witness, as Winslow would have testified that petitioner called his mother's auto shop at approximately 10:49 a.m. on the day of the murder. (ECF No. 83 at 18.) Winslow's testimony relates to Claim 6(c), in which petitioner alleges that

> (c) Clark conducted no additional investigation and presented no additional alibi evidence after learning that Wellman would testify that the shooting took place earlier than Wellman or the prosecution had previously claimed.

(Ptn. at 118-119; see id. at 124-125; see also ECF No. 43 at 7.)

As set forth in the April 16, 2014 order in this action: "In a declaration submitted in support of Petitioner's motion for new trial, Winslow stated that he was at the shop's front desk helping a customer at 10:49 a.m., as evidenced by the customer's credit card receipt stamped at that time." The court then noted the following excerpt:

> While I was processing Ms. Sirmak's credit card at the front desk, or very soon afterwards, Sean O'Brien called on the telephone. When I picked up the telephone, Sean said, 'Is my mom there?' His mother, Deborah O'Brien, was outside the lobby in the parking lot talking to a customer. I told Sean I would get her, and put the call on hold. I then went outside and told Deborah that Sean was on the phone.
>
> Sometime prior to Sean's trial in February 2004, Sean's lawyer, James Clark, called me on the telephone at the garage. . . . At that time I was dealing with cashing out customers who had come to pick up their cars and trucks. My entire conversation with Clark lasted about one minute. Clark asked me if Sean had called the garage on the morning of February 26, 2003, the day of the crime. I told Clark that Sean had called. Clark asked me when Sean had called. I told Clark that off the top of my head I thought it was between 9:30 and 11 a.m. and that I was very busy but if I had a chance to look at the paper work from that morning I could be more precise. Clark responded that if I wasn't sure when Sean had called, he couldn't use me as a witness. That was the end of the conversation.

(ECF No. 31 at 2, citing 7 CT 1757-1758.)

At trial, petitioner testified in his own defense. In recounting events on the day of the shooting, he never mentioned calling the auto shop or talking to Winslow on the day of the murder. When questioned by police, petitioner stated that he had returned his friend Frank

Silici's call at 10:45 a.m. but did not mention a call to the shop. (6 RT 1278-1279; 1 CT 289-290.) In her trial testimony, Deborah O'Brien, petitioner's mother, did not mention any call by petitioner to her shop on the morning of the shooting. (6 RT 1419-1441.)

At the evidentiary hearing, Winslow testified as follows: In February 2003, he was employed as the service manager at Cameron Park Automotive. (EHRT 31-32.) After the shooting, Clark asked him about the morning of February 26, 2003, and Winslow told Clark that petitioner called between 9:30 and 11:00 a.m. (EHRT 36.) Winslow recalled this conversation with Clark taking place over the phone. (EHRT 57.) Clark told him he would not need to testify at trial because "since I worked for Debbie, . . . people probably wouldn't believe me." (EHRT 37.) Clark never called Winslow to testify at trial. (EHRT 47.)

Winslow further testified at the hearing that, in February 2003, petitioner called the shop every day "about 10 o'clock" to speak to his mother, and Winslow recognized his voice. (EHRT 39, 55.) Winslow didn't mention to Clark that petitioner called the shop every morning, because Clark "didn't ask." (EHRT 57.)

Winslow worked for petitioner's mother, and after petitioner's arrest, they discussed his upcoming trial every day. (EHRT 54.) After the trial began, Winslow "was concerned that they didn't ask me to be a witness because I know he [petitioner] called then." (EHRT 59.) Near the end of the trial, he stated, Clark came to the body shop, and Winslow asked to speak to him a second time in the back room. (EHRT 59.)

> Q: And what did you tell him there?
>
> A: I said I know Sean called that morning, and I wanted, you know, to testify if I can. And he told me I'm not needed.
>
> Q: Did you tell him what time –
>
> A: Yeah.
>
> Q. – he called that morning?
>
> A: Right. I told him.
>
> Q: You told him it was at 10:49?
>
> A: I told him it was sometime between 10:00 – or 9:30 and 11:00.

Q: You told him sometime between 9:30 and 11:00?

A: Right.

Q: So you told – so you didn't give him any more details about what time it was?

A: No.

Q: So you hadn't looked at the service records at that time?

A: No. I looked at the records later.

. . .

Q: So the first time you looked at the records was after the trial?

A: Yes.

Q: And that was with a private investigator?

A: Yes. But I didn't need the records during the trial because it was so fresh in my memory. I knew he called at that time, so I didn't really need –

Q: Between 9:30 and 11:00?

A: Yeah. Right.

(EHRT 59-60; emphasis added.) Later in his testimony, Winslow confirmed that he "couldn't pinpoint [the] exact time" of petitioner's call when he spoke to Clark. (EHRT 68.)

The records in question were shop records from the morning of the shooting. They included a February 26, 2003 invoice for customer Joan Sirmack, who authorized work at 10:16 a.m. (EHRT 40-41; E612.) Winslow testified that the call from petitioner came "right around" when he was standing at the counter helping Ms. Sirmack, "because prior to that I was not at the counter." (EHRT 41-43.) Winslow cited records for a second customer he helped that day, Andy Beale, whose work sheet was stamped 10:42 a.m. (EHRT 43-44; E615.) Lastly, he cited a receipt of sale for Ms. Sirmack printed at 10:49 a.m. (EHRT 44-45; E617.) Having reviewed these documents, Winslow testified that they refreshed his recollection that petitioner called him "[b]etween 10:16 and 10:49" on the day of the shooting. (EHRT 45-46.) After being shown his declaration, he revised the timing of the call to "[r]ight before 10:49." (EHRT 46.)

////

12

In June 2004, after petitioner's conviction at trial, a private investigator for the defense suggested that Winslow review the shop records from February 26, 2003 "to help trigger a memory" of exactly when petitioner called that day. (EHRT 61, 63.) Winslow testified that seeing these records "brought the whole day back, so I could really pinpoint the time [of the call] from seeing that schedule . . . It really helped." (EHRT 61.) He testified that petitioner "could have called . . . between 10:15 and 10:49, because those are the times I was by the phone," i.e., helping Joan Sirmack as reflected in the records. (EHRT 61-62.) Nearly two years after reviewing these records with the investigator, in February 2006, Winslow signed a declaration stating that "[w]hile I was processing Ms. Sirmak's credit card at the front desk, or very soon afterwards, Sean O'Brien called on the telephone." (EHRT 63-64; see 7 CT 1757-1758.)

At the evidentiary hearing, Clark testified that Winslow called him and said that he "received a phone call from Sean on the morning of the murder" but could not "give me a specific time." (EHRT 152-153.) Clark testified that when he pressed Winslow for a "definite time" for the call, Winslow "[hemmed] and hawed. And I said, Okay, that's fine, Ned. I can't use you." (EHRT 153.) "I was grinding him, you know, Tell me what you got," Clark said of his call with Winslow. (EHRT 155.) "There was nothing. I mean, there was nothing like, Geez, Jim, I can go back and reconstruct my time to a given time. It was nothing like that at all . . . [W]hat I primarily remember was he was hemming and hawing as to specificity as to the time of the call. And, you know, I'm a bottom line type of guy. I didn't get that, I wasn't interested." (EHRT 155.) Clark further testified that, because Winslow worked for petitioner's mother, "[t]here was an issue of raising the [spectre] of whether or not he'd been influenced by his employer." (EHRT 153.)

After trial began and the alleged time of the shooting suddenly shifted to between 10:30 and 11:30 a.m., Clark did not further investigate Winslow's statement. (EHRT 158.) He had no recollection of Winslow calling or approaching him during the trial or "saying that he remembered a specific time Mr. O'Brien had called him that morning[.]" (EHRT 160.) There were no phone records of a call from petitioner's house to the body shop that morning, Clark testified, but his understanding was that no record of a local call would have existed either way.

13

(EHRT 162.)

Overall, the evidence adduced at the evidentiary hearing was inconsistent with Winslow's 2006 declaration, which stated that Winslow told Clark "that off the top of my head I thought it was between 9:30 and 11 a.m. . . . but if I had a chance to look at the paper work from that morning I could be more precise." (CT 1758.) Nothing in Winslow's testimony indicates that he offered to "look at the paper work . . . to be more precise" when he spoke to Clark, or that this idea had even occurred to him at that time. Rather, a defense investigator hired by Ms. O'Brien after the trial suggested that Winslow peruse receipts dated February 26, 2003 in an attempt to pin down when petitioner might have called.

Given that Winslow could only provide a 90-minute window for the phone call before trial and there was no other evidence that petitioner called the shop that morning at all, Clark's decision not to call Winslow did not constitute deficient performance, nor has petitioner shown prejudice as a result of this decision.

3. William Wellman

a. Hoagland Report

Petitioner's Claim 6(e) concerned the four-page police report ("Hoagland Report") provided to Clark on February 4, 2004, after trial had begun.[9] In that claim, petitioner alleged that Clark

> failed to utilize exculpatory evidence [in the report], including but not limited to Wellman's statement that O'Brien was not on the telephone while he was at O'Brien's house, Wellman's statement that O'Brien did not have or use a cell phone, Wellman's statement that a gun shop employee was putting handguns into a case when Wellman arrived at the gun shop, Wellman's statement that he and Dickson drove down Green Valley Road after leaving the Treasure Lane Residence, and Hoagland's statement that the route down Green Valley Road took 47 minutes.

(Ptn. at 119.)

Wellman, who was serving a term for second-degree murder pursuant to his plea bargain, testified at the hearing. He described his January 2, 2004 meeting with Detective Hoagland,

---

[9] See E193-196 (petitioner's exhibit of Hoagland Report).

1  prosecutor Joe Alexander, and other law enforcement members to go over the details of the

2  shooting.  (EHRT 192-196.)  The meeting followed Wellman's July 2003 entry of a plea to

3  second degree murder premised on his cooperation with the prosecution.  (EHRT 187.)

4      At the hearing, Wellman confirmed that he told Detective Hoagland at the meeting that

5  petitioner didn't have a cell phone and didn't make any phone calls in Wellman's presence on the

6  day of the shooting.  (EHRT 196-197.)  Detective Hoagland noted these statements in his report.

7  (E193.)  While petitioner argues that Clark was ineffective for failing to adduce this information

8  at trial, it is unclear how it would have helped petitioner's case.  There was no evidence at trial

9  that petitioner made calls from a cell phone and/or made calls in Wellman's presence.  In fact,

10  Frankie Silici, who said that he and petitioner had been good friends for years and spent time

11  together daily, testified that petitioner did not own a cell phone at the time of the shooting.  (3 RT

12  512-513, 533.)  Thus, any testimony to this effect by Wellman would have been cumulative.  See

13  Clabourne v. Lewis, 64 F.3d 1373, 1382 (9th Cir. 1995) (failure to present cumulative testimony

14  does not amount to ineffective assistance).  While the jury heard the times that Wellman claimed

15  to be at petitioner's house on the day of the shooting, Wellman did not testify that petitioner made

16  any calls in his presence.

17      Petitioner argues that testimony from Wellman that "O'Brien never used the telephone

18  while he was supposedly in O'Brien's house would have established that Wellman and Dickson

19  were not inside O'Brien's house between 10:11 and 10:30 a.m. when O'Brien was on the

20  telephone with Silici and Michaud.  Such evidence would have proved that Wellman and

21  Dickson, if there at all, arrived at O'Brien's house *after* the 10:30 a.m. telephone conversation

22  between O'Brien and Michaud."  (ECF No. 83 at 20-21.)  Frankie Silici testified that he called

23  petitioner at 10:11 a.m. on the morning of the shooting, as corroborated by phone records

24  introduced at trial.  (3 RT 547.)  But no phone bill or other evidence corroborated Michaud's

25  claim that she talked to petitioner at "about 10:30 a.m. in the morning" (3 RT 563), and the jury

26  could have reasonably inferred that one or more witnesses were mistaken or imprecise about the

27  ////

28  ////

timing of events that morning.[10]  The prosecutor argued that the trio could have arrived at the gun shop as early as 10:15 a.m. (RT 1663), implicitly suggesting that the call between Michaud and petitioner took place earlier that morning.  In light of the above, any testimony by Wellman that petitioner didn't use the phone in his presence would not establish facts about the timeline that would have likely changed the outcome.

The Hoagland Report noted that Wellman "recalled an employee behind the counter placing guns in the display case and a middle-aged customer talking to another employee about an upcoming hunting trip."  (E194.)  Petitioner argues that Clark's failure to present this information at trial prejudiced him.  However, as discussed above, Wellman's witnessing of a store employee returning guns to a case could not establish what time Wellman was at the shop.  As Gilmore explained, guns could have been brought out at the request of a customer at any time during the day, and then returned to their cases.  At the hearing, Wellman testified that he had no memory of "an employee . . . behind the counter placing guns in a display case," though he did not dispute what was written in the Hoagland Report.  (EHRT 199-200.)

The Hoagland Report further noted that "Wellman was . . . uncertain on the exact route they drove to and from the victim's residence," though he recalled "travelling on Green Valley Road when they left Treasure Lane" and also driving past "the Wal-Mart on Forni Road." (E194.)  After Wellman's statements, Detective Hoagland experimentally drove between petitioner's house, the gun shop, the victim's house, and back to petitioner's house at the posted speed limit, allowing five minutes to purchase shotgun shells and five minutes to enact the shooting. [11]  He noted in the report that this route (the "Green Valley Road" route) resulted in a

---

[10] See 2 RT 374 (Wellman testified that he and Dickson spent 30-40 minutes at petitioner's house on the morning of the shooting, but he was not wearing a watch on the day of the shooting and "had no place to be, so I wasn't really keeping track of time"); 3 RT 565 (Michaud testified that she did not recall how long she talked to petitioner that morning and didn't "really remember the pieces of conversation from a year ago"); 7 RT 1571 (Dickson testified that he and Wellman spent "[n]ot long at all, maybe between five and ten minutes" at petitioner's house on the morning of the shooting).

[11] At the hearing, the parties stipulated that "Detective Hoagland drove the route described in the report contained at pages E195 of Petitioner's exhibit based on the information Wellman gave Hoagland detailed in the report on pages E193 to E195."  (2 EHRT 4.)

travel time of 47 minutes. (E195.)

At trial, Hoagland testified that he drove three different routes between petitioner's house, the Big Horn Gun Shop, the victim's house, to the pond on Forni Road, and back to petitioner's house. (5 RT 1125-1132.) On each drive, he drove the posted speed limit and obeyed all traffic signals, pausing briefly to approximate the time spent buying the ammo, the robbery and shooting, and throwing the gun into the pond. (5 RT 1129.) Hoagland testified that the first two routes took between 36 and 40 minutes, factoring in a 30-second stop to purchase shells. (6 RT 1128-1131.) He testified that, driving the third route (the Green Valley Road route), he paused "five full minutes" at the gun shop, and the route took approximately 47 minutes. (5 RT 1131-1132.

Petitioner argues that Clark rendered ineffective assistance by failing to ask Hoagland which of the three routes he drove was based on Wellman's statements in the Hoagland Report, presumably because this would establish that the drive took 47 minutes. Petitioner maintains that, because there was no 47-minute gap between petitioner's phone calls, this evidence would prove he did not accompany Wellman and Dickson to the shooting. His argument goes as follows: On the morning of the murder, using his home phone, petitioner spoke with Silici at 10:11, Michaud at 10:30, and Carrick at 11:14, such that the longest "gap in his alibi" between calls lasted 44 minutes, and the Hoagland Report proved that the driving route took 47 minutes; thus, petitioner could not have participated in the crime.

However, the purported three-minute difference between the time needed to drive the Green Valley Road route and the 44-minute gap between petitioner's calls is based on approximations, not established facts. As discussed above, there was no evidence that Michaud spoke to petitioner at "about 10:30 a.m." other than her and petitioner's statements. (6 RT 1279.) Moreover, as discussed below, petitioner failed to produce any admissible evidence besides his own trial testimony that he called Carrick at 11:14 a.m. Petitioner testified that he called his friends Richard Lacerte and Richard Anshutz around 11:30 a.m. (6 RT 1281), which was reflected in phone records. (3 RT 624, 629, 634.) But, given the uncertain timing of the other calls that morning, petitioner fails to show how testimony as to the driving routes mentioned in

the Hoagland Report would entitle him to relief.

At the evidentiary hearing, Clark testified that he thought all three routes Detective Hoagland timed fit within the gap in the phone records in which petitioner arguably had no alibi, and "I was definitely worried about it." (EHRT 166.) Clark testified that it also wasn't entirely clear which route was taken, because "what Wellman said [to Detective Hoagland] wasn't all that specific." (EHRT 166.) Harboring doubts as to admissibility, Clark testified, "I just – I felt it was a loser so I let it go." (EHRT 167.)

Having reviewed the various pieces of allegedly exculpatory evidence in the Hoagland Report as urged by petitioner, it does not appear that Clark's eliciting testimony on any one of them, or all of them, would have established an alibi for petitioner during the crucial gap between his objectively verifiable phone calls that morning. Petitioner has not shown deficient performance or prejudice as to Claim 6(e).

b. Change in Timeframe

Petitioner's Claim 6(d) also involved Wellman:

> Clark failed to adequately cross examine Wellman and Clark failed to introduce evidence to the jury that Wellman only changed his testimony as to the timing of the shooting after Clark had disclosed O'Brien's alibi evidence to the prosecutor on December 22, 2003.

(Ptn. at 119.)

In a March 7, 2003 interview with police, Wellman stated that the robbery took place sometime between 11:00 a.m. and 2:00 p.m. (2 RT 462-463.) By trial, Wellman's estimation of the time frame had changed to earlier in the day, when there were gaps in petitioner's alibi.

At trial, Wellman testified that he was not sure what time events occurred because "that day I really had no place to be, so I wasn't really keeping track of time." (2 RT 374.) He testified about the terms of his plea bargain, but stated that no law enforcement personnel had asked him to change his testimony in exchange for the plea bargain. (2 RT 419-420.)

On cross examination, Clark questioned Wellman about the timing of events that day, and Wellman repeated that he didn't have a watch on and "wasn't paying attention." (2 RT 439-440.)

Wellman estimated that he had arrived at petitioner's house around 9:00 a.m. and, after the shooting, dropped petitioner off around 11:00 a.m. (2 RT 433, 455.) In his closing argument, Clark argued that Wellman changed the timeframe he gave in March 2003 because "he wants to helpful in convicting my client so that prison door opens up a little more[.]" (7 RT 1701.)

At the evidentiary hearing, Wellman testified that, shortly before his January 2, 2004 meeting with law enforcement, his attorney told him that "there may be a question about the time frames" that Wellman had provided several months earlier. (EHRT 204, 213.) Wellman testified that his attorney informed him that "the times didn't line up" with the time of death as estimated by the coroner. (EHRT 209, 215.) After speaking with his attorney, Wellman "changed [his] story," telling Detective Hoagland on January 2, 2004 that he arrived at petitioner's house "between 9:00 and 9:30 a.m." and left approximately fifteen minutes later. (E193.)

Questioned extensively about the circumstances surrounding his changed story at the evidentiary hearing, Wellman testified that no one asked him to change his story, that he did not feel he would lose his plea deal if he failed to change his story, and that he had been "trying to testify honestly." (EHRT 192-196, 209, 214.) He further testified that no one told him that he needed to change his story to a specific different time. (EHRT 215.)

At the evidentiary hearing, the Court asked Clark to clarify how "Wellman's time change played into your strategy regarding impeaching Wellman." (EHRT 176.) Clark testified that Wellman initially appeared credible; and, as Wellman had never met petitioner before the day of the shooting, "I had nothing to impeach him on until he changed his story." (EHRT 177-178.) Afterward, Clark intended to argue to the jury that

> He was in trouble, he was looking at life [in prison], there was a light at the end of the tunnel and he was going to come and take it regardless of whether he had to tell the truth or not. . . . So I had some opportunity to finally throw some dirt at him and I intended to undertake that. And I – I tried my best.

(EHRT 178.) Clark testified that he thought he could highlight Wellman's changed story for petitioner's benefit "because a jury would conclude, that guy is lying, and the DA's case is nonsense[.]" (EHRT 179.)

////

19

Based on the foregoing, petitioner has not shown deficient performance or prejudice as to Claim 6(d). The evidentiary hearing did not adduce any new evidence that Wellman had lied or been advised to lie in exchange for a plea deal, such that Clark could have done anything meaningfully different with this witness at trial.

### 4. Mike Carrick

#### a. Phone Call

In Claim 6(h), petitioner asserts:

> Clark failed to present corroborating evidence that O'Brien called Mike Carrick from his home telephone at 11:14 a.m. even though Clark discussed this evidence in his opening statement at trial.

(Ptn. at 120.)

In his opening statement at trial, Clark told the jury he would present evidence that at 11:14 a.m. "O'Brien called a gentleman by the name of Mike Carrick. That will be documented, I believe, by phone records and/or testimony." (2 RT 343.)

At trial, petitioner testified: "I called Mike Carrick at some time that morning and he called me back about 11:14, 11:15, sometime in there." (6RT 1281; emphasis added.) Petitioner testified that he contacted Carrick because Carrick was "going to come over that afternoon . . . to hang out, smoke some pot." (6RT 1281.) No phone records were introduced in support of this testimony.

Prior to trial, Clark obtained Carrick's cell phone records, which showed an incoming call at 11:14 a.m. on the day of the shooting, but did not indicate what number the call came from. (EHRT 106, 7 CT 1775.) The phone log also showed an incoming call to Carrick's phone at 11:47 a.m. (7 CT 1775.) Meanwhile, J..D. Petty's phone records showed an outgoing call to Carrick's phone number at 11:47 a.m.[12] (9 CT 2542.)

In a March 5, 2003 taped interview with Detectives Hoagland and Moschini, Carrick stated that on the day of the shooting, petitioner called him at school "[p]robably around 11:15, 11:30, somewhere right around there[.]" (9 CT 2329.) In an August 9, 2006 declaration, Carrick

---

[12] Petty testified at trial that he called Carrick's cell phone at 11:47 a.m. (3 RT 698-699.)

stated that he "did not remember the time of the phone call" but that in 2005, in connection with petitioner's state habeas case, he had inadvertently signed an attorney-drafted declaration stating that the call took place at 11:14 a.m. (9 CT 2401.) In his 2006 declaration, Carrick clarified:

> That is not correct. I cannot say what time I received the phone call. In fact, if pinned down, I would have to say the phone call was later that morning because I remember getting out of school shortly after the phone call. At that time I was getting out of school at 12:00.

(9 CT 2401.)[13]

In his March 2003 interview with Detectives Hoagland and Moschini, Carrick stated that petitioner described the robbery to him "after he did it, he like showed me the money and is like I went up to the house and I robbed it and got this money . . . and he had a little chuckle about it." (9 CT 2308-2309.) Carrick stated that petitioner told him he had been to the Treasure Lane house once or twice, and that it was up on a hill and an "easy spot." (9 CT 2308-2309.) Carrick stated that petitioner showed him $2,600 that he took from the house, and they counted the money together. (9 CT 2309.) Carrick stated that petitioner told him that he, Tyler Dickson, and William Wellman drove to the house, knocked on the door, and when no one answered, they kicked the door in. (9 CT 2361.) Carrick stated that petitioner told him he had a shotgun during the robbery. (9 CT 2363.) Carrick told Hoagland and Moschini that petitioner recounted how he shot Smelser when Smelser confronted him with a rifle, and then petitioner, Wellman, and Dickson took money from the house. (9 CT 2363-2364.) Carrick stated that petitioner used the money from the robbery to buy marijuana from Carrick's cousin. (9 CT 2336-3227.)

At the evidentiary hearing, Clark stated that he wanted Carrick to testify at trial, but that Carrick's counsel indicated that Carrick would be "taking the Fifth [Amendment] for all purposes." (EHRT 129-131; see 4 RT 893-895.) Clark believed that Carrick's invocation of his Fifth Amendment privilege meant "the analysis and the inquiry is over," and so did not press for

---

[13] At the evidentiary hearing, Clark acknowledged that he didn't introduce a phone record showing that Carrick called petitioner on his home phone at 11:44 a.m. on the day of the shooting. EHRT 173-174. While this would have established that petitioner was home at 11:44 a.m., the jury heard evidence that petitioner spoke to Anschutz by phone ten minutes earlier. A second call at 11:44 a.m. would not establish an alibi during the key time, earlier in the day.

1    Carrick's testimony about the 11:14 a.m. phone call from an unknown number.  (EHRT 134-135.)

2    Clark further testified at the hearing that he did not ask Detective Hoagland about the statements

3    Carrick made in his March 2003 interview because Clark believed those statements were

4    inadmissible hearsay.  (EHRT 138-139.)

5        Petitioner argues that Clark was ineffective in accepting Carrick's "blanket assertion" of

6    his Fifth Amendment privilege against self-incrimination, which petitioner asserts is contrary to

7    California law.  See People v. Trujeque, 61 Cal.4th 227, 267-269 (2015) ("A witness . . . may not

8    make a blanket assertion of the privilege against self-incrimination.").  In Trujeque, however, the

9    California Supreme Court explained  that "a trial court may reject an assertion of the privilege

10   only when it appears to the court *perfectly clear*, from a careful consideration of all the

11   circumstances in the case, that . . . the answer[s] cannot *possibly* have [a] tendency to

12   incriminate."  Id. at 267 (emphasis in original), citing Cal. Evid. Code section 404.  At trial,

13   Carrick invoked the privilege in response to possible questions about the destruction of evidence;

14   his "knowledge and participation of the purchase of a large sum of marijuana" around February

15   26, 2003; his theft of money from at ATM machine; his participation and/or knowledge of thefts

16   from an ATM account owned by Deborah O'Brien; and involvement with Tyler Dickson and

17   Kyle Ruben.  (4 RT 893-895.)  After these potentially incriminating topics were raised and

18   Carrick invoked the Fifth Amendment for each one, his attorney confirmed that he would be

19   "taking the Fifth for all purposes."  (4 RT 895.)

20       Though he was not specifically questioned about it, Carrick's phone conversation with

21   petitioner on the day of the shooting was also potentially incriminating: not only could it have

22   linked him to the knowledge of a robbery and murder, but petitioner testified that he phoned

23   Carrick so that the two of them could (illegally) smoke marijuana that afternoon.  (6 RT 1281.)

24   Petitioner also testified that, later that day, he, Carrick, and a third person (illegally) purchased

25   $2,000 worth of marijuana.  (6 RT 1286.)  It was reasonable for Clark to believe that Carrick's

26   invocation of his privilege against self-incrimination would extend to his communications with

27   petitioner on the day of the murder, including any phone calls between them.  If Carrick had

28   testified that such a call occurred, it could have opened him up to cross-examination on the nature

of the call, i.e., potentially incriminating questions. Assuming <u>arguendo</u> this argument is not procedurally barred, as discussed <u>supra</u>, petitioner has not shown deficient performance under <u>Strickland</u> on this basis.

Petitioner next claims that Clark was unreasonable in not asking Detective Hoagland about Carrick's March 2003 interview, in which Carrick stated that petitioner called him "[p]robably around 11:15, 11:30, somewhere right around there" on the day of the shooting. (9 CT 2329.) While Clark believed such statements were inadmissible hearsay, petitioner argues that they fell under the "unavailable declarant" exception to the hearsay rule set forth in California Evidence Code section 1350. However, Carrick's invocation of his Fifth Amendment privilege does not make him "unavailable" under the statute, which requires that "the declarant's unavailability . . . is the result of the death by homicide or kidnapping of the declarant." Cal. Evid. Code section 1350(a)(1). Assuming <u>arguendo</u> this argument is not procedurally barred, petitioner has not shown deficient performance under <u>Strickland</u> on this basis.

At the evidentiary hearing, petitioner did not supply any new evidence that he spoke to Carrick at 11:14 a.m. on the morning of the shooting. At best, Clark could have introduced phone records at trial showing that an unknown person called Carrick at that time. Petitioner testified at trial that Carrick called him around 11:15 a.m., which does not correspond to the <u>incoming</u> call to Carrick at 11:14 a.m. For his part, Carrick was vague on the timing of petitioner's call but stated in 2006 that he believed it occurred close to noon, when school let out. Even if Clark had shown that petitioner spoke to Carrick at 11:14 a.m., there was no corroborating evidence that petitioner spoke to Michaud at 10:30 a.m. (as discussed above), such that petitioner would be precluded from the alleged 47-minute round trip to the Treasure Lane house. Based on the foregoing, petitioner has not shown deficient performance or prejudice as to Claim 6(h).

b. <u>Marijuana Money</u>

Claim 6(m) also involves Carrick:

> Clark failed to present evidence which established that the money used by O'Brien and Carrick to buy marijuana on the afternoon of the shooting came from the improper use of ATM cards, not from Jesse Pine's room in the Treasure Lane residence.

(Ptn. at 121.)

Jessie Pine, who lived at the Treasure Lane House with Kyle Smelser, testified at trial that he used and sold marijuana. (4 RT 907-908.) Pine testified that Frankie Silici had purchased marijuana from him and brought petitioner with him to the Treasure Lane House. (4 RT 909-190; see also 3 RT 539 (Silici's testimony that petitioner accompanied him to the Treasure Lane House to purchase marijuana "a couple of times")). Pine testified that, on February 26, 2003, he came home to find Kyle Smelser dead of a gunshot wound and his (Pine's) bedroom door open, with a box missing from his dresser drawer that had contained about $3,000 in cash. (4 RT 914-916.) Pine testified that he knew the amount because he counted the cash on a daily basis and used it to buy large amounts of marijuana. (4 RT 916.)

At trial, petitioner testified that, on the afternoon of the murder, he, Carrick, and a third person purchased $2,000 worth of marijuana from Carrick's cousin, Nate McKelvie. (6 RT 1286.) Petitioner testified that he supplied $800, which he had acquired from "selling pot," and Carrick supplied the other $1,200. (6 RT 1286.)

One issue at trial was how petitioner acquired the cash to buy marijuana that afternoon. As recounted in the state court of appeal's decision summarized above, petitioner's friend Richard Anschutz testified that when he spoke to petitioner by phone at 11:34 a.m. that morning, petitioner said he had $2,500 to buy marijuana but didn't want to discuss where he got the money over the phone. (ECF No. 16-1 at 14.) Petitioner's friend Cliff Sargent testified that, while he was at petitioner's house on the afternoon of the shooting, petitioner "showed me a big wad of money . . . a wad of cash." (3 RT 725-726.)

Q: Did Mr. O'Brien tell you how he got that money?

A: Yeah, but I thought he was joking.

Q: Okay. I understand you thought he was joking, but what did he tell you about how he got the money?

A: I'm sorry. I asked how he got the money. And, joking around, he said he killed somebody for it. And I laughed.

Q: You thought it was a stupid joke?

A: I wouldn't believe any of my friends if they said it.

Q: All right. And you didn't believe Mr. O'Brien when he said it?

A: No.

Q: Was he laughing?

A: No. It wasn't like hysterical or nothing. Just a little comment.

Q: Other than that, did he tell you how he got the money?

A: No.

(3 RT 726.) The prosecutor argued that petitioner had acquired the cash from the Treasure Lane House. (7 RT 1683-1684.)

An alternative theory was that petitioner had acquired the money from selling drugs and/or unauthorized withdrawals from his mother's bank account. Petitioner testified that, on multiple occasions earlier that month, he had used his mother's ATM card to withdraw a total of $1,400 from her account. (6 RT 1287.) Deborah O'Brien testified that petitioner admitted to her in March 2003 that he had made multiple unauthorized withdrawals from her ATM account in the past few weeks. (6RT 1420-1421, 1425-1426.)

Clark called Deputy Sheriff Paul Hadjes to testify that O'Brien and Carrick both made withdrawals using Deborah O'Brien's ATM card. (6 RT 1453-1455.) The jury heard the following stipulation: "Detective Hadjes, during the course of his investigation of this case, spoke to one Michael Carrick. During the course of an interview with Mr. Carrick, Mr. Carrick admitted that he had some responsibility for using Debbie O'Brien's ATM card. However, he indicated that he was given the PIN number of Ms. O'Brien and the card by one Sean O'Brien, and he made various ATM withdrawals over the course of the month of February and of March." (6 RT 1455.) The parties further stipulated that there was a photo of Carrick withdrawing money from the ATM at 8:14 a.m. on February 26, 2003, the morning of the shooting. (6 RT 1455-1465.) Detective Hadjes testified that Carrick withdrew $500 that day and also withdrew $500 on February 12, 2003. (6 RT 1456-1457.)

At the evidentiary hearing, the parties stipulated: "Information was available at trial that Mike Carrick made unauthorized ATM withdrawals from Deborah O'Brien's bank account on February 24th and 25th of 2003. Each of these withdrawals was for $500." (ECF No. 82, EHRT

4.)

Petitioner argues that Clark was ineffective in failing to show that Carrick made additional withdrawals from Debbie O'Brien's account in February, which would show how he contributed $1,200 to the marijuana purchase on the day of the shooting. Even if additional evidence of Carrick's ATM withdrawals had been adduced, however, it would not have accounted for petitioner's reported "wad of cash" that afternoon, his statements to Anschutz, and his self-professed contribution of $800 to the marijuana purchase. The jury heard that Carrick knew Deborah O'Brien's pin number, had access to her bank account, and had withdrawn money from it multiple times; thus, there was evidence to support a reasonable belief that Carrick supplied $1,200 for the marijuana purchase, as petitioner claimed. On the other hand, there was evidence to support the conclusion that petitioner acquired cash for the drug purchase from his robbery of the Treasure Lane house earlier that day. Petitioner has not shown deficient performance or prejudice as to Claim 6(m).

### 5. J.D. Petty

As noted above, it appears from the post-hearing briefs that petitioner has abandoned Claim 6(i) in the petition. This claim alleges that "Clark failed to adequately cross examine J.D. Petty about his claim that he met O'Brien at the bottom of his driveway shortly after 7:55 a.m. when Petty's school records showed that Petty was in class at that time." (Ptn. at 120.)

At the evidentiary hearing, Jonathan "J. D." Petty testified that, in 2003, he was attending Community Day School, on the same campus as Independence High School. On February 26, 2003, he drove to petitioner's house "on the morning on my way to school, dropped the shotgun off, and went to school." (2 EHRT 6.) He confirmed his trial testimony that he dropped the gun off between 7:00 and 8:00 a.m. and called petitioner's house and spoke to him at 7:55 a.m., as evidenced in his cell phone records. (2 EHRT 6, 9-10.) Petty testified that school started between 8:00 and 8:15 and was "just down the street" from petitioner's house, about a mile away. (2 EHRT 10-11.) Petty reviewed school records that indicated he was present for every period that day. "I don't remember, specifically, the time that I arrived, but I would assume that I arrived on time as I was marked as being there on time," Petty testified. (2 EHRT 16.) Petty

testified that it was a small class of eleven students, and the teacher took formal attendance by having the students raise their hands when called.  (2 EHRT 17-18.)

As petitioner adduced no new evidence from Petty that would have helped him at trial, he has not shown deficient performance or prejudice as to this claim.

### 6. Chantelle Michaud

As noted above, it appears from post-hearing briefs that petitioner has abandoned Claim 6(k), alleging that "Clark failed to adequately cross examine Chantelle Michaud about her relationship with Tyler Dickson and the fact that she knew Dickson was involved in the Treasure Lane shooting."  (Ptn. at 120.)

At the evidentiary hearing, Michaud testified that she was "strictly friends[]" with Tyler Dickson, who attended her high school.  Detective Hoagland came to her house and questioned her about the Treasure Lane shooting.  "They pretty much just asked me if Sean and Tyler were friends, or if we had all gone to school together.  That was pretty much what they were getting at," she testified.  (EHRT 15-16.)  The detectives asked about "multiple Tylers" with different surnames, including her friend Tyler Dickson.  (EHRT 16.)  The next day at school, between classes, she saw Tyler Dickson in the hall and "told him the police were at my house and dropped his name."  (EHRT 17.)  Dickson later messaged her "and wanted to know the name of the officer who came to my house."  (EHRT 17.)  Michaud did not tell Dickson to go to the police or accompany him to the police station, and she could not recall whether she called him later that day.  Before he went to the police station, she met him in a parking lot, "and I gave him a hug good-by, and that was the last time I had seen him besides court."  (EHRT 19.)  "I heard a few days later that he was arrested at school."  (EHRT 20.)  Michaud was surprised by the arrest "[b]ecause I honestly did not believe that Tyler was involved in anything like this. . . . He was a very lovable guy."  (EHRT 20-21.)

Clark testified at the evidentiary hearing that Michaud was one of two witnesses who he considered harmful to petitioner's case at trial.  "She was bad news for us."[14]  (EHRT 176-177.)

---

[14] As summarized by the state court of appeal, supra: Michaud testified that she called petitioner at home at 10:30 on the morning of the murder, when he said he was going to get some

27

As petitioner adduced no new evidence from Michaud that would have helped him at trial, he has not shown deficient performance or prejudice as to this claim.

In sum, for the reasons set forth above, the witness testimony and evidence presented at the evidentiary hearing failed to show that Clark's performance was deficient and/or prejudicial under Cannedy/Strickland as asserted in the remanded claims.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  Where, as here, a habeas petition is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can show:  (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"  Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).   Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file

---

marijuana, money, and dirt bikes that day.  He said the place where he would get these things had roommates, but he did not think they would be home.  He told Michaud he was leaving after their phone call.  That evening, Michaud asked petitioner if everything had gone okay.  Petitioner said, "No, it didn't go okay," and told her he didn't want to talk about it over the phone.  Later that evening, Michaud saw a report of Smelser's murder on the television news.  The next day, she asked petitioner if that was what went wrong the day before.  In a pretrial interview, Michaud told police that he had answered her question affirmatively.  (ECF No. 16-1 at 13-14.)

objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  October 29, 2019

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2/obrien2472.f&rs